Jon T. Dyre
CROWLEY FLECK PLLP
500 Transwestern Plaza II
P. O. Box 2529
Billings, MT 59103-2529
Telephone: (406) 252-3441
Facsimile: (406) 252-5292
jdrye@crowleyfleck.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISON

| | | |
|---|---|---|
| HIGH COUNTRY PAVING, INC, | ) | Cause No.: 9:18-cv-00163-DLC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **UNITED FIRE & CASUALTY** |
| | ) | **CO.'S PRELIMINARY** |
| UNITED FIRE & CASUALTY CO., | ) | **PRETRIAL STATEMENT** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Pursuant to Local Court Rule 16.2 (b), United Fire & Casualty Company

("United Fire") submits this Preliminary Pretrial Statement.

**(A)     A brief factual outline of the case**

This is the case that the Montana Supreme Court said could never happen in

*Watters v. Guaranty National Ins. Co.*, 2000 MT 91, ¶ 41, 300 Mont. 91, 3 P.3d

626 (2000).  United Fire is being sued by its insured for paying policy limits

without a release in a case where liability in excess of policy limits was reasonably clear.

High Country Paving, Inc., ("High Country") purchased a primary insurance policy from United Fire that provided combined single limits of $1,000,000 per occurrence. High Country also purchased a $2,000,000 umbrella policy. On August 12, 2016, one of High Country's employees was driving a dump truck that was pulling a trailer carrying a road grader on Baxter Lane in Bozeman. The dump truck, trailer and road grader were owned by High Country. Due to the extreme negligence of High Country and its driver, the trailer and grader came loose from the dump truck, crossed the centerline and crushed a 2007 Honda Accord in which Christine Fogerty was the driver and her mother, Mary Elgen, was a passenger. Ms. Fogerty was killed in the crash and her mother was catastrophically injured. High Country's liability was clear and aggravated. High Country's driver was criminally prosecuted for his numerous violations of motor vehicle and highway safety laws.

On or about August 17, 2016, Christopher Edwards notified High County that Mary Elgen and the Estate of Christine Fogerty had retained the Edwards Law Firm to represent them in all claims they had arising out of the August 12, 2016 accident and requesting that High Country preserve all evidence. High Country sent the notice to United Fire. United Fire retained Nick Pagnotta to defend High

Country.  On November 30, 2016, United Fire advised High Country that liability could exceed policy limits and to retain personal counsel.  Working with the Edwards Law Firm, United Fire advance paid medical and other expenses as requested by the Edwards Law Firm.

High Country retained the Goetz firm as its independent counsel in July of 2017.

On October 31, 2017, the Edwards Law Firm demanded United Fire pay the $3,000,000 policy limits and refused to release High Country from the claims of Mary Elgen and the Estate of Fogerty.  The demand included a claim for punitive damages, and was supported by medical records, bills, expert reports, investigative reports, photographs and a video recording.

High Country objected to United Fire paying policy limits without a release, but on November 9, 2017, Jeff Tierney of the Goetz firm wrote a letter demanding as follows:

> High Country asks that UFG make available its coverage under all of its policies and coverages in order to secure a **good faith settlement** of the injured parties' claims with a release for High Country and its agents. (emphasis added).

At the time, Mr. Tierney was alleging that there may actually be $4,000,000 in coverage, meaning he was taking the position that a "good faith settlement" of the claims against High Country was up to $4,000,000.

With the consent of High Country's attorneys, and United Fire, Mr. Pagnotta offered $3,000,000 policy limits conditioned on a release of all claims against High Country. That offer was rejected by the Edwards Law Firm by a letter dated November 27, 2017. The letter restated the demand for $3,000,000 without a release of High Country and ended as follows:

> High Country/UFG does not have a reasonable basis for not settling this case without a release. Furthermore, UFG's duty here is to our clients. UFG is breaching that duty and attempting to lever our clients' damages in exchange for a release. The $3,000,000.00 simply needs to be paid without a release or UFG is exposed to a substantial bad faith claim. That said, we will offer UFG a release from its violations of the UTPA and its obligations under *Gibson* v. *Western Fire Ins. Co.*, 210 Mont. 267 for the verdict in this case, if UFG tenders the policy limits without a release for High Country paving within 10 days of this letter.

On November 27, 2017, the Edwards Law Firm also sent a letter to High Country demanding that High Country pay an additional $2,500,000 in exchange for a release.

Under Montana case law, when liability equal to or in excess of policy limits is reasonably clear, an insurer is not allowed to ask for a release of its insured as a condition of payment. High Country admitted in Mr. Tierney's November 9, 2017 letter that the good faith settlement value of the survivor and wrongful death claims of the Estate of Christine Fogerty and the personal injury claim of Mary Elgen exceeded $3,000,000. United Fire agreed, and was therefore obligated to pay the $3,000,000 policy limits without a release. Over the unfounded objections of High

Country and in accordance with Montana law, United Fire paid the policy limits less advance payments without a release of High Country or United Fire.

High Country later settled with the Edward firm by paying at least an additional $1,275,000 for a release of all claims against High Country, thereby confirming that the settlement value of the claims exceeded $3,000,000.

High Country then sued United Fire for violations of the Unfair Trade Practices Act and bad faith.

**(B)     The basis for federal jurisdiction and for venue in the division**

This case was removed to federal court pursuant to 28 U.S.C. §§ 1441 and 1446 from the Fourth Judicial District of the State of Montana, County of Missoula, Civil Action No. *DV*-18-1160, to the United States District Court for the District of Montana, Missoula Division based on diversity of citizenship under 28 U.S.C. § 1332(a).

There is complete diversity of citizenship. High Country is organized under the laws of Montana with a principal place of business in Belgrade, Montana. High Country is therefore a citizen of Montana for federal diversity purposes.

United Fire is an Iowa corporation headquartered in Cedar Rapids, Iowa and is therefore a citizen of Iowa for federal diversity purposes.

High Country seeks to recover over $1,275,000 from United Fire, which meets the requirement for the amount in controversy.

Under Local Rule 3.2, venue is proper in any division of the court containing a county of proper venue under the laws of the State of Montana. Under Montana law, a lawsuit alleging tort claims may be brought were the defendant resides. § 25-2-122(a) MCA. A defendant corporation incorporated outside Montana may be sued in tort where the resident agent is located. § 25-2-122(2)(c) MCA. United Fire's registered agent is located in Missoula, Montana.

**(C)  The factual basis of each claim or defense advanced by the party**

**1.  United Fire had to pay policy limits without a release after High Country demanded that United Fire make available all of its coverage under all of its policies in order to secure a good faith settlement of the injured parties' claims with a release for High Country and its agents.**

It is not clear from the complaint whether High Country relies solely on a legal argument that policy limits can only be paid without a release of the insured when undisputed special damages exceed policy limits, or if it also alleges that the reasonable settlement value of the claims of Mary Elgen and the Estate of Christine were less than the $3,000,000 paid by United Fire. Assuming that High Country is asserting the latter claim, United Fire acted reasonably in paying policy limits without a release.

On October 31, 2017, the Edwards Law Firm sent a letter demanding that United Fire pay the $3,000,000 policy limits with a release of the claims against High Country.

High Country objected to United Fire paying policy limits without a release, but on November 9, 2017, Mr. Tierney wrote a letter demanding as follows:

> High Country asks that UFG make available its coverage under all of its policies and coverages in order to secure a **good faith settlement** of the injured parties' claims with a release for High Country and its agents. (emphasis added).

At the time, High Country was alleging that there may actually be $4,000,000 in coverage, meaning High Country was taking the position United Fire should pay up to $4,000,000 to secure a "good faith settlement" of the claims against High Country.

United Fire acted reasonably by following the request of High Country. Under Montana law, the duty to settle is a fiduciary duty running from the insurer to the insured, by virtue of the insurance policy. *Thompson v. State Farm Mutual Automobile Ins. Co.*, 161 Mont. 207, 505 P.2d 423 (1973). An insurer that fails to reach a "good faith settlement" of claims within policy limits breaches this duty and may be liable for any verdict or settlement in excess of policy limits. *Gibson v. Western Insurance* 201 Mont. 267, 682 P.2d 725 (1984). Had United Fire refused Mr. Tierney's demand that limits be paid, High Country would have an argument that United Fire had essentially waived limits for any adverse verdict or settlement.

United Fire agreed that the good faith settlement value of the claims against High Country exceeded $3,000,000. Therefore, with the consent of High

Country's attorneys, United Fire offered the $3,000,000 policy limits conditioned on a release of all claims against High Country.

On November 27, 2017, the Edwards Law Firm rejected that offer and again demanded United Fire pay $3,000,000 policy limits without a release of High Country.

Once the offer to settle without a release was rejected, United Fire acted reasonably by paying $3,000,000 without a release. An insurer owes third party claimants a duty to attempt to reach a good faith settlement of claims under § 33-18-201(6). An insurer may not:

> (6) neglect in good faith to effectuate prompt, fair, and equitable settlement of claims in which liability has become reasonably clear.

This section protects third party claimants by placing a duty on insurers to engage in good faith settlement practices. *Klaudt v. Flink*, 658 P.2d 1065 (1983). There, the Court held:

> By enacting this subsection, the legislature has reacted to what it perceives to be an important problem. Insurance companies have, and are able to exert, leverage against individual claimants because of the disparity in resource base. Justice delayed is often justice denied. Public policy calls for a meaningful solution. The legislature has spoken and we, by this decision, breathe life into the legislative product.

*Id.*

The Montana Supreme Court has made it clear that the settlement value of claims does not change depending on whether or not there is a release of the insured. The good faith settlement value of claim is determined by the insured's

liability and the claimants' damages. The requirement of a release is only relevant to a potential claim for leveraging and is prohibited by both § 33-18-201(6) and § 33-18-201(13).

United Fire would have violated § 33-18-201(6) had it refused to pay the policy limits previously offered without a release of High Country. Once High Country admitted through Mr. Tierney that the good faith settlement value of the claims against it exceeded $3,000,000 and demanded United Fire offer policy limits, the die was cast. The good faith settlement value had been established as over $3,000,000. At that point, the § 33-18-201(6) required United Fire pay limits without a release.

### 2. United Fire had a reasonable basis for concluding that liability in excess of policy limits was reasonably clear

Again, it is not clear from the complaint whether High Country relies solely on a legal argument that policy limits can only be paid to settle claims without a release of the insured when undisputed special damages exceed policy limits, or if it also alleges that the reasonable settlement value of the claims of Mary Elgen and the Estate of Christine was less than the $3,000,000 paid by United Fire. If it is latter, the United Fire will show that it had a reasonable basis to conclude that liability in excess of limits was reasonably clear.

Liability for the accident aggravated. The jury instructions would allow the jury to award virtually unlimited general damages for pain, suffering, grief, loss of

consortium and emotional distress, and a punitive damages claim. Because there was viable punitive damages claim, the aggravated liability facts would be admissible even if High Country admitted liability.

High Country's driver was pulling an 8,500 pound road grader on a trailer behind dump truck down Baxter Lane near Bozeman, a two lane road heavily traveled by the public. The driver, who was criminally prosecuted, failed properly hitch the trailer to the dump truck and failed to connect and/or adjust the trailer brakes. The trailer with the grader on it came loose from the dump truck, crossed the center line, and hit Christine Fogarty and her mother Mary Elgen head on, obliterating the 2007 Honda Accord they were driving. Christine Fogarty died at scene, mere inches from her mother who was conscious, but trapped by the wreckage of the Honda.

The aggravated liability factors are set forth in the Accident Report and Supplemental Report prepared by the Montana Highway Patrol (MHP). The Highway Patrol found the dump truck driver 100% at fault. MHP concluded that the pintle hitch was not properly used. The the safety chains designed to prevent a runaway were attached to a piece of rebar High Country had welded on the dump truck. When the trailer came loose, the weld on the rebar broke, rendering the safety chains useless. The trailer brakes that should have stopped the trailer once it became unhitched were either not connected or seriously out of adjustment or both.

An inspection by the Motor Carrier Safety Division at the accident scene found seven violations on the dump truck and trailer with three of them being out of service violations.

The report also contained a statement from Trooper Velquez that Mary Elgen was trapped in the Honda by the crushed roof. She was in obvious, severe pain, but could not move. She kept repeating that she hurt, and Trooper Velaquez tried to lift the roof off of her from outside to relieve her pain. When that did not work, he crawled into the wreckage and lifted the roof with his body to take the weight of Ms. Elgen. She asked Trooper Velaquez if her daughter was okay, and Trooper Velaquez had to lie and say the EMTs would be checking on her.

On October 31, 2017, the Edwards Law Firm presented a $3,000,000 policy limits demand to United Fire and refused to provide a release of High Country. The Edwards Law Firm had been representing the Elgen/Fogerty family since August of 2016. Cliff Edwards was a longtime family friend. The Edwards Law Firm had been submitting medical records and bills and other expenses, which United Fire advance paid.

The demand letter included ten exhibits: including the MHP Crash Report; the MDOT Investigative Report; an detailed report by truck driving expert Roger Allen; a video of Ms. Fogerty's daughters and parents talking about their mom/daughter and her plans; newspaper articles about Ms. Fogerty; an expert

report by Tom Bennett, M.D., that Ms. Fogerty did not die instantly; and medical records, bills, and counseling records.

The MDOT investigation found that High Country was above the Federal Motor Carrier Safety Administration's (FMCSR) threshold in Unsafe Driving (74%), Crash (74%) and Vehicle Maintenance (97%). It stated in part:

> The review indicates that you do not have adequate safety management controls in place to effectively ensure acceptable compliance with Montana State Laws, Federal Motor Carrier Safety Regulations and or Federal Hazardous Materials Regulations. There is a high probability that a CONDITIONAL rating maybe issued. The violations listed are of a serious nature and are directly related to unsafe transportation in intrastate commerce.

The MDOT report included the following witness statement:

> [o]n 06/01/2017 at about 7 am, I parked across the street from the carrier and watched as drivers did poor or no pre-trip inspections ... I questioned [Debra Swenson] about any training for pre-trip inspections that they might have provided to the driver. Debra Swenson they had not trained the drivers on pre-trip inspections, nor was there any disciple [sic] or meaningful action taken for drivers who do not do them.

The MDOT Report also included the following statement:

> I examined the truck and trailer (at impound) and found no damage or failure of the pintle hook on the truck and no damage to the eye on the trailer. The pintle hook latch worked properly. Glad-hands (air line connections) were not damaged on either vehicle. I would have expected the airlines to be ripped off the truck or trailer or damage to the glad-hands when the trailer separated from the truck. It is plausible that the trailer air lines were never connected to the truck prior to the crash.

The report from expert Roger Allen concluded that High Country had violated the following FMCSR regulations.

• §3 79 .13 - Disposition and Retention of Records (Note A)

- §382.303 - Post-Accident Testing

- §382.601 - Employer obligation to promulgate a policy on the misuse of alcohol and use of controlled substances

- §382.603 -Training for supervisors

- §390.3 (e) (1) & (2)-General Applicability

- §390.5 - Definitions

- §391.11 (b) (3) - General Qualifications of Drivers

- §391.21 - Application of Employment

- §391.23 - Investigation of Inquiries

- §391.51 - General Requirements for Driver Qualification Files

- §391.53 - Driver Investigation History File

- §392.1 - Scope of the Rule in this Part

- §392.2 - Applicable Operating Rules

- §392.7 - Equipment, Inspection and Use

- §392.9 - Inspection of cargo, cargo securement devices and systems

- §393.70(d) - Safety devices in case of tow-bar failure or- disconnection

- §393.71 - Coupling devices and towing methods, driveaway-towaway operations

- 393.130 - What are the rules for securing heavy vehicles. equipment and machinery?

- §395.8 - Driver's Record of Duty Status

- §396.3 - Inspection Repair and Maintenance

- §396.7 - Unsafe Operations Forbidden

- §396.11 - Driver Vehicle Inspection Report(s)

- §396.13 - Driver Inspection

Mr. Allen also stated that while the safety chains on the trailer were

themselves adequate, there was only one piece of steel cable (rebar) that both

chains were hooked on to. The truck should have had two connectors attached to the rear of the truck for each individual safety chain. As a result, the inadequate single cable (rebar) failed when the trailer came off. Having two connectors attached to the truck as required would have prevented this tragedy by keeping the trailer behind the truck. Mr. Allen said it was unfathomable that a trucking company would allow a truck on the road, with a loaded heavy trailer that is only secured by the single wire cable.

Mr. Allen also stated that the glad-hands were not connected to the truck which would have meant there was no braking to the trailer or on the trailer.

The demand letter estimated lost future earnings for Ms. Fogerty. She was 58 years old when killed in the accident. She made $67,852.00 per year. Her future earnings for 10 years, reduced to present value at a 2% discount rate, were $609,486.36. This demand was very conservative. It did not include a claim for fringe benefits, which are generally an additional 30% of wages for employees with a college education. The demand did not include the value of lost household services, which can be recovered in a wrongful death action. *Hern v. Safeco Ins. Co.*, 2005 MT 301, ¶ 40, 329 Mont. 347, 125 P.3d 597. The demand did not include lost retirement benefits. Adding these additional damages would more than double Ms. Fogerty's special damages.

Ms. Fogerty's parents, siblings, and daughters would be entitled to damages for reasonable compensation for grief, sorrow and mental anguish. *Id.*, ¶ 62.

The demand letter included the following list of initial injuries for Mary Elgen, supported by medical documentation:

1. Stellate, complex laceration of left forehead involving transection of eyebrow, full thickness laceration of skin, frontalis muscle with exposed frontal bone.

   • Laceration length 28.3 cm 1

   • Questionably viable islands of skin between ragged lacerations. Laceration stretching from the eyebrow up to above the hairline.

   • Vl numbness can be inferred - complex through and through lacerations of left forehead including expected location of supraorbital, supratrochlear nerves.

   • Laceration left nasal sidewall.

2. Rib fractures - fractures:

   • Left 2nd – 7th ribs.

   • Either pulmonary contusion and/or aspiration.

3. Left forearm fractures:

   • Left comminuted distal ulnar fracture with moderate displacement.

   • Left olecranon fracture with 3cm gap between fragments.

   • Open fracture left elbow.

4. Left tibia/fibula fractures:

   • Highly comminuted proximal tibial periarticular fracture with associated proximal fibular fracture

   • Proximal tibial and fibular fractures with mild angulation.

   • Prepatellar hematoma.

5. Injuries to the left hand:

- Acute fractures of the proximal phalanges of the left index finger, ring finger and 5th finger.

- Evulsion injury at the distal phalanx of the left thumb.

- Left third proximal interphalangeal (PIP) laceration with intra-articular extension.

- Additional nondisplaced fracture at the base of the 4th metacarpal.

6. Grade 3 splenic injury with surrounding hemorrhage.

7. Pulmonary contusion with atelectasis and probably pleural effusion involving the left chest in the mid chest to the lung base.

- hemothorax

8. Acute blood loss anemia - required blood transfusions.

9. Eye injury:

- Traumatic dislocation of IOL2 left eye with associated blurry vision.

10. Traumatic brain injury

11. Chipped tooth. #8 MIFL (mesial incisal facial lingual)

The demand letter listed the additional problems/injuries related to accident, with supporting information:

1. 9/27 /16 - hearing loss in her left ear.

2. 10/20/16 - 10/31/16 - hospital admission

- Left parotid abscess.

- Acute renal failure.

3. 5/16/17 - ED Visit

- Pain and swelling of knee, left.

- Left leg cellulitis.

4. Panic attacks, very emotional.

5. 5/30/17 - Additional eye problems: diagnosed by Dr. Cosgrove with right homonymous hemianopia3•

6. 7 /26/17 - chronic residual pain left knee due to the amount of destruction to the proximal tibia.

The letter listed the following surgeries and other procedures with supporting documentation:

1. 8/12/16 Repair of forehead laceration and left nasal sidewall.

2. 8/13/16 Orthopedic Surgery:

   • Irrigation and debridement of left open olecranon fracture.

   • Open reduction and internal fixation of left olecranon fracture.

   • Open reduction and internal fixation of left distal ulnar shaft fracture.

   • Closed reduction and percutaneous pinning of left bony mallet injury, left thumb.

   • Closed reduction and percutaneous pinning of left 2nd, 4th, and 5th proximal phalanx fractures.

   • Left third proximal interphalangeal (PIP) arthrotomy with irrigation and debridement of an open wound.

   • Closed reduction and splint immobilization of left proximal tibia fracture, periprosthetic.

3. 8/14/16 IVC filter placement.

4. 10/20/16 Attempted ultrasound aspiration of the left parotid gland.

5. 11/30/16  IVC filter removed

6. 2/16/17    Surgery - left eye, exchange intraocular lens IOL.

7. 6/09/17   Steroid injection to treat episodic shooting neuropathic pain in scar from laceration of forehead/periorbital area.

8. 7/06/17    Crown done to repair damaged tooth

9. December 2017 Knee surgery.

The demand included medical bills to date of $283,991.09.

Although no formal life care plan was provided, the demand included the cost of assisted living. Ms. Elgen's injuries precluded her from living at home with her husband. The cost of living at Brookdale Meadow for the remainder of Ms. Elgen's life expectancy was $595,342.91.

The letter also stated Mary has been getting counseling as a result of the wreck and her resulting injuries and mental trauma. The letter stated it was clear from the counseling records that the loss of her daughter and her independence haunts Mary and clearly tortured by survivor's guilt. Mr. Elgen would be entitled to damages for loss of consortium.

Special damages were $1,549,881.25, and were very conservative. If the case had gone to trial, the Edwards Law Firm would have presented their usual array of experts and special damages would have been well over $2,000,000. Given the clear aggravated liability, general damages would have taken the likely verdict well over $3,000,000.

In addition, High Country has admitted that a jury verdict would exceed $3,000,000. First, High Country's lawyers wrote the November 9, 2017 letter stating "a good faith settlement" would exceed $3,000,000. Second, after United Fire paid $3,000,000, High Country realized its personal assets were at risk and

paid at least an additional $1,275,000 to avoid the risk of a verdict in excess of $3,000,000.

### 3. United Fire did not "bankroll" the Edwards Law Firm Lawsuit

The complaint alleges that the settlement by United Fire "bankrolled" the litigation against High Country. United Fire intends to call one or more members of the Edwards Law Firm to testify that the Edwards Law Firm had the financial ability to pursue a lawsuit against High Country with or without the $3,000,000 policy limits settlement from United Fire.

In addition, United Fire could not condition payment of the limits of the primary policy upon settling all claims under the umbrella policy without violating § 33-18-201(6) and (13) MCA. A very conservative estimate of special damages exceeded $1,000,000, meaning the primary policy had to be paid with a release. The $1,000,000 policy limits was adequate to fund any litigation.

### 4. United Fire could not assist High Country's attempt to leverage a settlement within policy limits

High Country alleges that when United Fire complied with its duty to pay policy limits without a release, High Country lost the opportunity to leverage the Edwards Law Firm into settling within policy limits and thereby avoid personal liability. United Fire intends to call one or more members of the Edwards Law Firm to testify that they would not have succumbed to High Country's attempted leverage had United Fire not paid $3,000,000 without a release of High Country.

**5. United Fire sought and relied on the advice of counsel in deciding to pay policy limits**

United Fire acted reasonably in responding to the conflicting bad faith claims by seeking and following the advice of counsel in (1) determining there was no coverage under the CGL policy; (2) determining the reasonable settlement value of the claims against High Country exceeded policy limits; and (3) determining it had a duty to pay policy limits without a release of claims against High Country or United Fire.

**(D)   The legal theory underlying each claim or defense, including, where necessary to a reasonable understanding of the claim or defense, citations to authority**

**1. The duty to pay policy limits without obtaining a release is not limited to situations where undisputed special damages exceed policy limits.**

The Montana Supreme Court has rejected the argument that the duty to settle without a release only applies to advance payments of undisputed damages. The Montana Supreme Court has held that the obligation to "settle" claims in § 33-18-201(6) "encompasses both the initial payment of individual claims for which liability is reasonably clear, and the final settlement of all claims." *Lorang v. Fortis Insurance Co.*, 2008 MT 252, ¶ 167, 345 Mont. 12, 192 P.3d 186. The prohibition against releases applies to both § 33-18-201(6) and (13):

> We further hold that nothing in the UTPA requires a general release of the insured or the insurer as a condition to a § 33-18-201(6) or (13), MCA, settlement.

*Shilhanek v. D-2 Trucking, Inc.*, 70 P.3d 721, 727 (Mont. 2003), as modified (June 10, 2003), *opinion modified on reh'g*, 79 P.3d 1094 (Mont. 2003).

Although *Shilanek* and the earlier decision in *Watters v. Guaranty National Ins. Co.*, 2000 MT 91, ¶ 41, 300 Mont. 91, 3 P.3d 626 (2000), involved situations where medical expenses exceeded policy limits, the foundation of these decision has universal application. Both of those decisions were based on the Court's interpretation of § 33-18-201(6) MCA, which states no insurer shall:

> (6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

This duty is owed to third party claimants. § 33-18-242(1) MCA, and *Klaudt v. Flink*, 658 P.2d 1065 (1983).

In *Watters*, the Montana Supreme Court held that "settlement" under this subsection means an agreement between the injured party and the insurer, and a release of the insured is <u>not</u> required. *Watters*, ¶ 41. The Court found that the Legislature had declared that § 33-18-201(6) required payment without a release where liability was reasonably clear, and that there is nothing in this statute that allows settlements to be conditioned upon the claimant agreeing to a release of the insured. The Court said it was compelled to follow the clear language of the statute, and not second guess the Legislature. *Id.*, ¶¶ 50-51.

The Court's interpretation of "settle" in § 33-18-201(6) does not change based on the type of damages claimed. The definition must be applied uniformly

to all circumstances in which the insurer has a duty to settle because liability is reasonably clear, whether the damages are special damages or general damages. Neither the Legislature nor the Court limited the scope of § 33-18-201(6) to special damages or medical expenses, and neither can High Country.

In addition, third party claimants are intended beneficiaries of mandatory or optional motor vehicle liability policies, and the equal, if not more important purpose of third party coverage, is to protect the public from injuries caused by the tortious conduct of others. *Cross v. Progressive Ins. Co.*, 2019 MT 51, p. 30 (Sandefur dissent)(citations omitted.) United Fire owed an equal, if not superior duty to Ms. Elgen and the Estate of Fogerty to attempt in good faith to settle their claims.

The wrongful death and survival claims of the Estate of Christine Fogerty and the personal injury claim of Mary Elgen are "claims" under § 33-18-201(6) which United Fire had a duty to pay without a release once liability was reasonably clear.

**2. When High Country demanded that United Fire make available all of its coverage under all of its policies in order to secure a good faith settlement of the injured parties' claims with a release for High Country, it created a conclusive presumption that the good faith settlement value of those claims was over $3,000,000.**

Section 26-1-601 MCA sets forth a number of conclusive presumptions. The first is:

(1) the truth of a declaration, act, or omission of a party, as against that party in any litigation arising out of such declaration, act, or omission, whenever he has, by such declaration, act, or omission, intentionally led another to believe a particular thing true and to act upon such belief;

Mr. Tierney's November 9, 2017 letter demanded that United Fire to make available all of its coverage under all of its policies in order to secure "a good faith settlement" of the injured parties' claims with a release for High Country. At the time, High Country alleged there was $4,000,000 in available coverage. This letter was a declaration or act that High Country believed that a good faith settlement of the claims against High Country exceeded $3,000,000. This representation let United Fire to offer $3,000,000 as instructed by Mr. Tierney. High Country cannot bring a lawsuit against United Fire based on an allegation that the good faith settlement was less than $3,000,000 after it represented to United Fire that High Country believed the good faith settlement value exceeded $3,000,000. To do so would be bring § 26-1-601 into play and create a conclusive presumption that the good faith settlement value was up to $4 million.

### 3. The jury is not required to determine whether there was actual liability in excess of policy limits as the issues in a UTPA claim are separate from the issues in the underlying claim.

The jury is not required to determine whether there was actual liability in excess of policy limits as the issues in a UTPA claim are separate from the issues in the underlying claim. *Peterson v. St. Paul Fire & Marine Ins. Co.*, 2010 MT 187, ¶ 39, 357 Mont. 293, 239 P.3d 904.

Under § 33-18-201(6) and (13), the jury has to determine whether liability is reasonably clear. Liability is reasonably clear when a reasonable person, with knowledge of the relevant facts and law, would conclude, for good reason, that the defendant is liable to the plaintiff. *Id.*, ¶ 39. The jury applies an "objective standard" to judge the actions of the insurer under the facts and circumstances presented. *Id.*

Whether United Fire violated the Unfair Trade Practices Act is governed by a different statute. Section 33-18-242(5) states that an insurer does not violate the Unfair Trade Practices Act if had a reasonable basis in law or fact for its actions. Therefore, the ultimate issue at trial will be whether the information available to United Fire provided a reasonable basis to conclude that liability in excess of policy limits was reasonably clear.

### 4. An insurer must ignore its insured's demand not to settle where liability is reasonably clear.

An insurer cannot excuse its failure to pay claims where liability is reasonably clear by claiming that it was following the wishes of its insured. *Etter v. Safeco*, 192 F.Supp. 2d 1071, 1074 (2002). Although that case involved a claim to advance medical expenses, and the plaintiff inexplicably agreed that there was no duty to pay limits without a release, the underlying principle that the insurer's primary duty is to the injured person has universal application.

**5. United Fire could not refuse to pay policy limits in order to allow High Country to leverage the Edwards Law**

High Country argues that United Fire payment of limits without getting it released from liability prevented High Country from "leveraging" a settlement, *i.e.*, forcing High Country to pay what is presumably a reasonable amount of its own money to settle for claims against it. Direct leveraging by an insurance company is expressly prohibited. *Watters, supra.* Assisting an insured's attempt to leverage would also violate an insurer's obligations to third party claimants.

**6. The standard for whether United Fire violated the implied covenant of good faith and fair dealing with respect to an insurer's obligation to settle is the same as under the Unfair Trade Practices Act**

Before this case was reassigned, Judge Christensen ruled that High Country can bring a breach of contract claim for breach of the implied covenant of good faith and fair dealing under § 28-1-211 MCA. Judge Christensen rejected United Fire's argument that § 33-18-201(1)-(14) MCA and § 33-18-242(1)-(8) MCA and provided more specific insurance industry standards than the general standard of "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade" under § 28-1-211 MCA. Judge Christensen acknowledged that there is no express contractual duty that an insurer obtain a release of its insured, but stated that "there appears to be an area of the law which could be navigated to justify a reasonable expectation United Fire would attempt to

negotiate a release for High Country before settling with the claimants in this case." Order p. 18.

United Fire did attempt to obtain a release as directed by Mr. Tierney, but the Edwards Law Firm refused. More importantly, an insured's reasonable expectations cannot include the expectation that the insurer will break the law by violating the Unfair Trade Practices Act. Therefore, the tort duties set forth in the Unfair Trade Practices Act to settle claims must also define the insurer's implied contractual duties to its insured to settle claims under the implied covenant of good faith and fair dealing.

### 7. There is no coverage under the CGL policy

The complaint references letters drafted by Jeff Tierney in which he argued on behalf of High Country that an additional $1,000,000 in coverage was available under the CGL portion of the Policy sold by United Fire. Complaint, paragraph 28. The complaint later states that "the Policy arguably excluded coverage for negligent maintenance, training and supervision claims." Complaint, paragraph 32. It is not clear whether the bad faith claim includes refusing to pay $1,000,000 under the CGL policy.

There is no coverage under the CGL policy. The policy contains the following exclusion:

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

* * *

## 2. Exclusions

This insurance does not apply to:

* * *

### g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading." This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

* * *

In addition to the above exclusion, the CGL policy contains the following

endorsement:

## MULTIPLE LIABILITY COVERAGES LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO COVERAGE
COMMERCIAL GENERAL LIABILITY COVERAGE

TRADE-PRO COVERAGE

BUSINESSOWNERS COVERAGE FORM

GARAGE-PRO COVERAGE

In consideration of the premium charged, it is agreed that coverage provided under the

COMMERCIAL GENERAL LIABILITY COVERAGE PART

does not extend to any loss where coverage is provided under the

COMMERCIAL AUTO COVERAGE PART

To the extent necessary, the court can determine as matter of law that the

CGL policy did not apply to the claims against High Country and that only

$3,000,000 in coverage was available.

**8. The payment of over $1,275,000 to settle High Country's potential liability is an admission that there was a risk that the jury could award damages in excess of the $3,000,000 paid by United Fire.**

It is undisputed that High Country paid over $1,275,000 after United Fire

paid $3,000,000 to settle the claims of the Estate of Fogerty and Mary Elgen. That

payment is an admission that a reasonable settlement of those claims exceeded

$3,000,000.

**(E)** **Computation of damages**

United Fire does not seek damages.

**(F)** **The pendency or disposition of any related state or federal litigation**

None.

**(G)** **Proposed additional stipulations of fact not included in the Statement of Stipulated Facts, see L.R. 16.2(b)(3), and the parties' understanding as to what law applies**

United Fire has no additional stipulation of facts.

Montana law governs.

**(H) Proposed deadlines relating to joinder of parties or amendment of the pleadings**

June 1, 2019.

**(I) Identification of controlling issues of law suitable for pretrial disposition**

The Court can and should determine pretrial as a matter of law the following issues.

**1. The duty to pay policy limits without obtaining a release is not limited to situations where undisputed special damages exceed policy limits**

This legal issue is not fact dependent. The existence and scope of a duty is a question of law. A pretrial decision will help avoid expert testimony on the subject of the duties owed by an insurer, which could invade the province of the court.

**2. The controlling legal standard for determining whether United Fire violated the Unfair Trade Practices Act is whether United Fired had a reasonable basis for concluding that damages in excess of policy limits was reasonably clear**

This issue needs to be answered to prepare jury instructions. It will also help define the appropriate areas of expert testimony and help avoid expert testimony on subjects which could invade the province of the court.

**3. The actual liability of High Country will not be decided by the jury**

This is also a legal issue, and should be determined in advance to define the scope discovery. The parties need to know if Ms. Elgen, her doctors, the investigating offers, etc., need to be deposed and called to testify at trial.

**4. United Fire could not refuse to pay policy limits in order to allow High Country to attempt to avoid personal liability by leveraging the Edwards Law Firm into settling for policy limits**

This is another question of law that will also help define the appropriate

areas of expert testimony.

**5. An insurer is not obligated to follow its insured's demand not to settle where liability is reasonably clear.**

This is another question of law that will also help define the appropriate

areas of expert testimony and help avoid expert testimony on the subject which

could invade the province of the court.

**6. The standard for whether United Fire violated the implied covenant of good faith and fair dealing with respect to an insurer's obligation to settle is the same as under the Unfair Trade Practices Act**

This is another question of law that will also help define the appropriate

areas of expert testimony.

**7. There is no coverage under the CGL policy**

This is a question of the interpretation of insurance policy which is a

question of law.

**8. The payment of over $1,275,000 to settle High Country's potential liability is an admission that there was a risk that the jury could award damages in excess of the $3,000,000 paid by United Fire.**

It is undisputed that High Country paid over $1,275,000 after United Fire

paid $3,000,000 to settle the claims of the Estate of Fogerty and Mary Elgen. The

issue of whether that payment is an admission that a reasonable settlement of those claims exceeded $3,000,000 is a question of law.

**9. When High Country demanded that United Fire make available all of its coverage under all of its policies in order to secure a good faith settlement of the injured parties' claims with a release for High Country, it created a conclusive presumption that the good faith settlement value of those claims was over $3,000,000.**

The November 9, 2017, is clear and provides the facts needed to trigger § 26-1-601 should High Country attempt to argue that the good faith settlement value of the claims was less than $3,000,000.

**10. Possible Disqualification of the Goetz Law Firm**

United Fire is concerned that attorneys from the Geotz Law Firm will be witnesses in this case. Mr. Tierney authored numerous letters which will likely become exhibits and therefore be the equivalent of testimony at trial. Most notable is Mr. Tierney's letter of November 9, 2017 in which he demanded that United Fire pay policy limits to reach a "good faith settlement" of the claims against High Country. United Fire will argue that this demand is an admission by High Country that a reasonable settlement value of the claims exceeded policy limits. That letter is also the basis for creating a conclusive presumption that a reasonable settlement value of the claims exceeded policy limits. To the extent High Country resists these arguments, Mr. Tierney may become a necessary witness.

United Fire will also argue that High Country's payment of an additional $2.55 million of consideration to settle the claims of Mary Elgen and the Estate of Christine Fogerty is an admission that High Country knew there was clear risk of a verdict against High Country in excess of $3,000,000. The settlement would not be introduced as evidence of actual liability, but as an admission that High Country recognized there was a significant risk to its personal assets. The documents produced by High Country show that Mr. Gardner was deeply involved in the negotiations that led to this settlement, thereby potentially placing him in the witness chair.

In addition, one of High Country's claims is that United Fire's payment of limits prevented High Country from leveraging the Edwards Law Firm into settling for less than $3,000,000. However, in the release signed by High Country, High Country "acknowledges that the Releasors (Mary Elgen and the Estate of Christine Fogerty) would not have settled this claim for the $1,275,000 payment from Releasee (High Country) without the additional Assignment of Claims, which Releasors value at $1,275,000, for a total settlement value of $5,500,000." This admission that the Releasors would not have settled for less than $5,500,000 defeats High Country's claim regarding leveraging. Mr. Gardner drafted the release for High Country.

Finally, the Assigned Claim was High Country's claim against its insurance agent for failing to acquire adequate liability insurance for High Country. In other words, the High Country claims $3,000,000 in coverage that the Agent acquired was not adequate to protect High Country from High Country's liability to Mary Elgen and the Estate of Christine Fogerty. In order for such a claim to exist, the reasonable settlement value of the claims of Mary Elgen and the Estate of Christine Johnson had to exceed $3,000,000. Mr. Gardner appears to have been involved in the Assignment of these claims.

Montana Federal District Court Local Rule 83.5 provides:

83.5 Attorney as Witness. If an attorney representing any party is examined as a witness in a case and gives testimony on the merits, the attorney may not argue the merits of the case, either to the court or jury, except by permission of the court, and as limited by the court.

Rule 3.7 of The Montana Rules of Professional Conduct states:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

United Fire does not want to file a motion to disqualify the Goetz Firm. As noted previously, it is not clear whether High Country alleges that the good faith

settlement value was less than $3,000,000.  If High Country is not making that

claim, then there should not be an issue.  Alternatively, there may not be an issue if

the officers of High Country can explain why High Country demanded that United

Fire pay policy limits as a good faith settlement and why they paid $1.275 million

above the $3,000,000 United Fire paid to get a release of claims.

That said, United Fire is providing notice that it believes disqualification of

some or all of the lawyers at the Goetz Firm may be inevitable.

**(J)    The name and city and state of current residence of each individual
known or believed to have discoverable information along that may be used in
proving or denying any party's claims or defenses.**

> **Trent Baker**
> **Jeff Tierney**
> **Goetz, Baldwin & Geddes**
> **35 North Grand**
> **Bozeman, MT**
> **(406) 587-0618**

Mr. Tierney was the primary point of contact between United Fire and High

Country and was intimately involved in communications and negotiations between

United Fire and High Country regarding the settlement of the claims against High

Country.  Mr. Baker was involved in settlement negotiations between High

Country and the Edwards Law Firm.

**Darin Swenson**
**Dereck Swenson**
**High Country Paving**

The Swenson should have information on why High Country paid more than

$2,550,000 of additional consideration above the $3,000,000 paid by United Fire to

settle the claims of the Estate of Fogerty and Ms. Elgen.

**John Edwards**
**Christopher Edwards**
**A. Clifford Edwards**
**Edwards Law Firm**
**Billings, MT**.
**(406) 256 8155**

These attorneys were involved in the communications and negotiations

between United Fire and the Edwards law firm, the negotiations and

communications High Country and the Edwards Law Firm.    United Fire expects

them to testify regarding the aggravated liability of High Country; the reasonable

settlement value of claims of the Estate of Fogerty and Ms. Elgen; the Edwards

Law Firm's ability to bankroll a lawsuit against High Country with first having

settled with United Fire; and to respond High Country's claim that United Fire

deprived High Country the ability to leverage a settlement Edwards' clients for less

than $3,000,000.  United Fire also expects them to testify that an insurer's

obligation to settle without a release of its insured is not limited to situations where

undisputed medical bills and lost wages exceed policy limits.

**Nick Pagnotta**
**Williams Law Firm**
**235 East Pine**
**P.O. Box 9449**
**Missoula, MT 59807**
**(406) 721-4350**

Mr. Pagnotta was retained by United Fire to defend High Country with respect to the claims of the Estate of Fogerty and Mary Elgen. He may be called to testify regarding the investigation, defense and settlement of the claims.

**Mark Farris**
**Field Representative**
**United Fire & Casualty**
**C/O Crowley Fleck**

Mr. Farris was one of the claims personnel who was involved in the early investigation of the accident and may be called to testify regarding his involvement in the responding to the claims.

**Monica Bohanon**
**Claims Supervisor**
**United Fire & Casualty**
**C/O Crowley Fleck**

Ms. Bohanon was one of the claims personnel who was handling the claims against High Country by the Estate of Fogerty and Mary Elgen and may be called as witness to testify regarding the investigation, defense and settlement of those claims.

**Mary Farjadi**
**Casualty Claims Specialist**
**Rocky Mountain Regional office**
**United Fire & Casualty**
**c/o Crowley Fleck**

Ms. Farjadi was one of the claims personnel who was handling the claims

against High Country by the Estate of Fogerty and Mary Elgen and may be called

as witness to testify regarding the investigation, defense and settlement of those

claims.

**Neal Scharmer**
**General Counsel and Vice President**
**United Fire Group**
**Cedar Rapids, IA**
**c/o Crowley Fleck**

United Fire expects to call Mr. Scharmer to testify regarding the evaluation

of the claims against High Country, coverage issues, and the decision to settle with

the Estate of Fogerty and Mary Elgen.

**Anne Belich**
**Claims Supervisor**
**Rocky Mountain Region**
**United Fire & Casualty**
**c/o Crowley Fleck**

Ms. Belich was one of the claims personnel handling the coverage and

potential excess and Unfair Trade Practices Act issues for United Fire.  United Fire

may call Ms. Belich testify regarding the evaluation of the claims against High

Country, coverage issues, and the decision to settle with the Estate of Fogerty and Mary Elgen.

> **Doug Walters**
> **Regional Claims Manager**
> **United Fire & Casualty**
> **c/o Crowley Fleck**

Mr. Walters is a retired Regional Claims Manager for United Fire & Casualty and prior to his retirement was involved in the evaluation of the claims against High Country and United Fire and the decision to settle with the Estate of Fogerty and Mary Elgen.

> **Brandy Niewald**
> **Rocky Mountain Branch Claims Manager**
> **United Fire & Casualty**
> **c/o Crowley Fleck**

Ms. Niewald was involved in in the evaluation of the claims against High Country and United Fire the decision to settle with the Estate of Fogerty and Mary Elgen.

> **David Conner**
> **Chief Claims Officer and Vice President**
> **United Fire & Casualty**
> **c/o Crowley Fleck**

Mr. Conner was involved in in the evaluation of the claims against High Country and the decision to settle with the Estate of Fogerty and Mary Elgen.

**Katie Huso**
**Matovich, Keller and Husso**
**2812 1st Avenue North, Suite 225**
**Billings, MT**
**(406) 252-5500**

Ms. Huso was retained by United Fire to provide advice regarding the claims

and demands against United Fire by High Country and by the Estate of Fogerty

and Mary Elgen. She may be called as a witness to testify regarding her

involvement in the investigation and evaluation of those claims and the settlement

of the claims of the Estate of Fogerty and Mary Elgen.

**Guy Rogers**
**Brown Law Firm**
**Billings, MT 59101**
**(406) 248-2611**

United Fire expects to call Mr. Rogers regarding his advice to United Fire

regarding United Fire's duty to settle the claims of the Estate of Fogerty and Mary

Elgen without a release of High Country and the reasonable settlement value of

those claims.

**(K)    The substance of any insurance agreement that may cover any resulting judgment**

None.

**(L)    The status of any settlement discussions and prospects for compromise of the case**

There are no ongoing settlement discussions. The prospects for settlement

are unknown at this time.

**(M)  Suitability of special procedures**

No special procedures are needed.

Dated this 25th day of March, 2019.

CROWLEY FLECK PLLP

*/s/* Jon T. Dyre
Jon T. Dyre
CROWLEY FLECK PLLP
500 Transwestern Plaza II
P. O. Box 2529
Billings, MT  59103-2529

Attorneys for Defendant