Robert K. Baldwin
Trent M. Gardner
Jeffrey J. Tierney
**GOETZ, BALDWIN & GEDDES, P.C.**
35 North Grand
P.O. Box 6580
Bozeman, MT  59771-6580
Ph:      (406) 587-0618
Fax:     (406) 587-5144
email:  rbaldwin@goetzlawfirm.com
           tgardner@goetzlawfirm.com
           jtierney@goetzlawfirm.com

Attorneys for High Country Paving, Inc.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| HIGH COUNTRY PAVING, INC., | Cause No. 9:18-cv-00163-DWM |
| Plaintiff, | Hon. Donald W. Molloy |
| v. | **PLAINTIFF'S PRELIMINARY PRETRIAL STATEMENT** |
| UNITED FIRE & CASUALTY CO., | |
| Defendant. | |

Pursuant to Federal Rule of Civil Procedure 26(a)(3), L.R. 16.2(b)(1) and the

Court's Order for Preliminary Pretrial Conference (Doc. 14), Plaintiff High

Country Paving, Inc. ("High Country"), through counsel, submits the following

preliminary pretrial statement based on information reasonably available to it.

# I.    BRIEF FACTUAL OUTLINE OF THE CASE.

This is an action for unfair claims settlement practices and breach of contract by United Fire & Casualty Co. ("Defendant"). High Country alleges Defendant breached its contractual and statutory duties by surrendering policy limits to protect itself without obtaining a release for its insured, High Country. Defendant did so: over High Country's objection; against the advice of insurance defense counsel; and against the advice of its own coverage counsel. Specifically, when the claimants invoked an insurer's duty to promptly pay certain categories of undisputed special damages under *Ridley v. Guaranty Nat. Ins. Co.*, 286 Mont. 325, 951 P.3d 987 (1997) to make baseless threats of extra-contractual liability, Defendant abandoned its duties to its insured and acted to protect only itself. Although Montana law does compel insurers to pay policy limits without requiring a release for the insured in cases where *Ridley* damages clearly exceed available coverage, Defendant settled without a release and left High Country to fend for itself when the claimants' *Ridley* damages were less than 10% of policy limits.

## A.    Background

High Country is a family-owned business that provides asphalt paving and maintenance services. High Country purchased various insurance policies and coverages from Defendant (totaling $5 million in coverage) to protect itself in the

event of an accident.

In August 2016, during the policy period, one of High Country's employees was involved in an accident while operating an insured High Country vehicle. While the vehicle was under way, a loaded equipment trailer came unhitched and collided with another vehicle, killing its driver, Christine Fogerty, and seriously injuring her passenger, Mary Elgen (collectively the "Claimants").

High Country notified Defendant of the accident and believed that its interests would be protected by Defendant.

## B.    Defendant improperly settled without a release for High Country.

In late 2017, Claimants' made a demand on Defendant "for High Country Paving's Policy Limits of $3,000,000.00" (the total of High Country's automotive and commercial umbrella coverage) *without* a release for High Country. Claimants' demand described "total special damages" of $1,549,881.25, only $283,991.09 of which could be fairly described as *Ridley* special damages.

High Country informed Defendant that it was supportive of any settlement within policy limits, so long as it fully resolved the dispute and included a liability release for High Country. High Country specifically and repeatedly objected to any settlement requiring payment of full policy limits that did not include a release and would leave it exposed to potential further liability.

Nick Pagnotta, High Country's defense counsel retained by Defendant, responded to Claimants' demand on November 14, 2017. Mr. Pagnotta explained that United Fire would advance all undisputed expenses caused by the accident as they arose, as required by *Ridley*, but "this does not appear to be a case where policy limits should be tendered without a release of our client…" because many of the damages making up the demand were general or punitive damages that were "debatable" and outside *Ridley*, so there was no basis to pay limits without a release for High Country. Accordingly, Mr. Pagnotta counter-offered to settle for $3 million *with* a full release for High Country.

Defendant understood its *Ridley* obligations and was, in fact, already making *Ridley* payments as the law required. Thus, as Claimants incurred special damages related to the accident, they tendered them, through their counsel, to Defendant, which paid them.

Claimants rejected Pagnotta's counter-offer and repeated their initial demand ($3 million with no release for High Country), subject to a ten-day deadline.

Just a few days before the deadline, Defendant's coverage counsel, Katherine Huso, informed High Country's counsel that Defendant intended to accept Claimants' offer and suggested that High Country try to reach a separate

settlement to secure a release on its own. High Country's counsel responded in writing and via telephone call, reiterating its position that accepting Claimant's demand without a release for High Country would be contrary to law and harm High Country.

During the same period, Defendant's coverage counsel, Huso, advised Defendant that the Claimants' assessment of Defendant's obligations under *Ridley* was erroneous and that paying policy limits without a release was not compelled by Montana law. Within a few hours, Defendant responded indicating that it intended to surrender policy limits without a release anyway.

Defendant could have easily protected itself, and its insured, by simply making (or continuing to make) required *Ridley* payments and continuing to defend the case and/or negotiate a complete settlement that included a release of High Country. Instead, Defendant: rushed to pay the full $3 million without a release when it was not required by law to do so; abandoned its insured; deprived its insured of a meaningful opportunity to participate or coordinate a combined settlement; eliminated almost all of the risk the Claimants might have faced in proceeding with litigation against High Country to prove their general and future special damages,; and helped fund litigation against High Country for which High Country had (according to Defendant) no remaining insurance coverage.

Left naked and abandoned, and with no negotiating position, High Country was forced to pay $1.275 million in cash and assign claims to Claimants which Claimants valued at an additional $1.275 million, in order to obtain a release from Claimants.

## C.    Defendant failed to timely provide High Country with a copy of its own policy.

During the same period, Defendant and its agents made incomplete and misleading representations about available coverage and failed to timely provide High Country with a complete copy of its policy, despite repeated requests from High Country.

Defendant prepared and possessed certified copies of High Country's policy which it timely provided to Defendant's own coverage counsel and the Claimant's counsel nearly a year earlier, in 2016. But, Defendant failed to provide the same information to High Country while falsely representing that a certified copy of the policy was unavailable.

Defendant later relied on exclusions set forth in the late-provided policy to deny further coverage under High Country's commercial general liability policy that might have facilitated a final settlement that included a release for High Country.

The exclusions that Defendant relied upon to deny coverage are also unenforceable as a matter of law and public policy for reasons including: the exclusions are ambiguous and did not clearly exclude coverage; the exclusions are non-compliant with the Montana Property and Casualty Insurance Policy Language Simplification Act; and Defendant is not entitled to rely on exclusions that it failed to timely provide to its insured. Upon information and belief, Defendant knew or had reason to believe the exclusions were unenforceable but still denied coverage.

## II.   BASIS FOR FEDERAL JURISDICTION AND FOR VENUE.

On September 19, 2018, Defendant removed this action from the Montana Fourth Judicial District Court, Missoula County pursuant to 28 U.S.C. § 1441 and 1446. Following removal, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000 and is between citizens of different states.

Pursuant to L.R. 3.2(b), proper venue for this action is in this division, because the Missoula Division contains a county in which venue would have been proper under the laws of the state of Montana. Mont. Code Ann. § 25-2-122. Regardless, each party has impliedly consented to venue in the Missoula Division pursuant to L.R. 3.2(c)(3).

## III. FACTUAL BASIS OF EACH CLAIM ADVANCED BY HIGH COUNTRY.

### A.    Count I - Unfair Claim Settlement Practices.

High Country's Count I alleges that Defendant engaged in unfair claim settlement practices in violation of the Montana Unfair Trade Practices Act ("MUTPA"), § 33-18-201, *et. seq.* Montana law prohibits certain claim settlement practices that are deemed by the legislature to be unfair, deceptive, or contrary to public policy and affords an aggrieved insured a private cause of action where, *inter alia*, its insurer fails to act in good faith "to effectuate prompt, fair, and equitable settlement of claims…" and/or where it "misrepresent[s] pertinent facts or insurance policy provisions relating to coverages at issue…." §§ 33-18-201(1), 33-18-201(6) and 33-18-242, MCA.

Only a fraction of the Claimants' damages were reasonably certain special damages under *Ridley*. Claimants' *Ridley* damages were substantially less than the limits of the insurance coverage High Country paid Defendant to provide. The remaining claimed damages were uncertain future special damages, general non-economic damages, and punitive damages that were subjective, uncertain, and depended on undiscovered and untried questions of fact.

Claimants' demand letter was clear that *Ridley* damages were only a small fraction of their demand and the bulk of the demand represented general damages,

punitive damages, and projected future special damages that were not certain to be incurred or certain in amount.

Defendant was aware of and was already discharging its obligation under *Ridley*, having made $131,872.66 in *Ridley* payments prior to settlement as the Claimants' incurred special damages and tendered them for payment.

Defendant's decision to pay the full $3 million demand was thus not compelled by *Ridley* or subsequent cases requiring payment of policy limits without a release when *Ridley* damages clearly exceed coverage. The kind of economic duress that mandates surrender of policy limits without a release in some cases simply did not exist. Instead, the majority of the coverage Defendant surrendered was a settlement of a disputed claim that Defendant was entitled and obligated to condition upon a release for High Country. By choosing to pay policy limits in substantial excess of *Ridley* damages without a release and before a lawsuit was even initiated, Defendant capitulated to a baseless threat of third-party bad faith liability and unfairly prioritized its own interests over achieving a fair and equitable settlement, in breach of its duty to High Country under § 33-18-201(6), MCA.

Defendant did so knowingly and against the weight of an overwhelming body of law and the advice of multiple Montana attorneys whom Defendant hired. Mr. Pagnotta, High Country's defense counsel hired by Defendant, clearly and

correctly explained the law in rejecting the Claimants' initial demand and offering instead to either settle for policy limits with a release, or else continue to pay *Ridley* damages and proceed to litigation to liquidate the remaining claims.

Defendant also obtained independent advice about this issue from its coverage counsel, Katherine Huso, who echoed Pagnotta's analysis and (as explained further in the below section describing the applicable law) advised Defendant that Claimants' demand was contrary to Montana law, did not require payment of policy limits without a release, and did not present a credible threat of third-party bad faith so long as Defendant continued to make *Ridley* payments.

Within hours after Huso provided her analysis to Defendant, Defendant's Vice President and General Counsel, Neal Scharmer, rejected Huso's advice and stated Defendants' intention to capitulate to the Claimants' demand. He wrote: "I think we need to advise the insured that we will likely accept the demand of payment of limits and solicit its willingness to offer additional sums. Those letter [sic] will need to be carefully worded."

A few days later, Huso advised High Country that Defendant was going to accept the Claimants' demand and surrender acknowledged policy limits without a release for High Country, justifying that decision by stating that Defendant believed it was obligated to accept the demand under *Ridley* and its progeny. That

"carefully worded" letter to High Country directly contradicted the written advice Huso had recently given Defendant.

Defendant also made numerous misleading representations about High Country's policy and coverage.

In November 2016, Defendant advised High Country of its coverage including $1,000,000 under its Commercial General Liability policy and $2,000,000 under its umbrella policy.

Thereafter, High Country made repeated requests for copies of the policy language, which Defendant ignored or failed to timely address.

Defendant prepared certified copies of the policy in 2016 and promptly provided them to its own coverage counsel. And, when the Claimants' attorney requested a copy of the policy, Defendant responded with the requested information within a week. In contrast, Defendant never provided a copy of the policy to High Country's independent counsel, despite numerous requests. High Country was eventually able to obtain the policy from Mr. Pagnotta, but only after many months of delay and too late to meaningfully analyze coverage before Defendant sold High Country down the river.

Defendant justified its failures to provide the policy by falsely telling High Country that a certified copy of the policy was not yet available when Defendant

had, in fact, prepared and provided certified copies to its coverage counsel and Claimants' counsel approximately a year earlier in 2016.

When Mr. Pagnotta was finally able to obtain and provide High Country with a copy of the policy, four months after High Country requested it and after settlement negotiations were already under way, the policy was different than the one Defendant had given to its coverage counsel, despite both copies being certified under penalty of perjury. The pages of the version provided to High Country were shuffled to emphasize the "multiple liability coverages limitation" endorsement, which had been moved towards the front.

Defendant relied on exclusions in the late-provided policy to justify withholding High Country's additional $1,000,000.00 in CGL coverage that might have facilitated a global settlement with a release of High Country.

Defendant also knew or should have known that the exclusions it relied upon to deny coverage in this fashion were unenforceable for failure to comply with the Montana law, including the Montana Property and Casualty Insurance Policy Language Simplification Act. Defendant's coverage counsel identified this problem just days before Defendant denied CGL coverage.

Defendant thus breached its duties under § 33-18-201(1), MCA.

**B.      Count II - Breach of Contract.**

Count II alleges that Defendant breached its contractual obligations to High Country under the insurance policy. The originally-pled claim alleges that Defendant breached the contract through commercially unreasonable conduct that deprived High Country of its justifiable expectations in contracting, in violation of the implied covenant of good faith and fair dealing. High Country is also amending its Complaint to add allegations regarding Defendant's breach of its duty to indemnify, breach of its duty to defend, and further allegations of dishonest and commercially unreasonable conduct in support of the previously-alleged breach of the implied covenant of good faith and fair dealing.

**1.      Breach of the duty to indemnify based on improper denial of CGL coverage.**

Defendant breached its duty to indemnify High Country by refusing High Country's request that Defendant make available an additional $1 million under High Country's commercial general liability coverage. Claimants made demand for payment in excess of High Country's automotive coverage and based on allegations unrelated to the operation of a vehicle, including negligent training, maintenance and supervision. On this basis, High Country made demand under the CGL, still not having had an opportunity to review the policy or to analyze potential exclusions because Defendant continued to ignore its insured's requests for the

policy.

Defendant ultimately refused High Country's demand for CGL coverage in reliance upon an "Aircraft, Auto or Watercraft" exclusion in body of the policy and an endorsement containing an additional exclusion titled "Multiple Liability Coverages Limitation."

As Defendant's coverage counsel recognized at the time, these provisions failed to comply with the Montana Property and Casualty Insurance Policy Language Simplification Act. The Policy does not contain a table of contents or notice section of important provisions calling out the above-described exclusions, as required under Montana law. *See* § 33-15-337(2), MCA.

In addition, the "Multiple Liability Coverages Limitation" endorsement is ambiguous and does not clearly exclude CGL coverage. The endorsement states that CGL coverage "does not extend to any loss where coverage is provided under the commercial auto coverage part." This language could be reasonably read in at least two different ways, only one of which excludes coverage. First, as Defendant apparently construed it, the endorsement could be read to exclude CGL coverage whenever there is *any* automotive coverage, regardless of whether the automotive coverage is sufficient to cover all of the claimed losses. Alternatively, the same language could be read as a prohibition on double-dipping under both coverages. In

other words, coverage under the CGL part is excluded to the extent damages are actually covered under the automotive part. Here, there were $2.5 million in claimed damages for which the automotive part *did not* provide any coverage because the claimed damages were in excess of limits under the automotive section.

Finally, it would be inequitable to permit Defendant to rely on exclusions that it failed to timely provide to High Country, despite numerous requests, which left High Country without necessary information when coverage decisions were being made and settlement discussions undertaken. As explained above, Defendant possessed copies of the policy, was capable of providing them on short notice, and did so (within days or weeks) when it provided that information to coverage counsel and Claimants' counsel. It then falsely represented to High Country that the policy was not available until the last minute when Defendant announced it was denying the CGL claim and settling without a release.

### 2. Breach of the duty to defend.

High Country contends Defendant breached its duty to defend by choosing to surrender policy limits without a release for High Country. By paying policy limits to protect its own alleged interests while leaving High Country exposed, Defendant: effectively bankrolled the prospective litigation against High Country; stripped High Country of any legitimate leverage to negotiate a favorable outcome

for itself; and substantially eliminated any risk the Claimants may have faced in proving their non-*Ridley* damages at trial. As a result, Defendants' offer to continue defending High Country was a hollow gesture, designed to provide cover for Defendant's self-interested decision to settle out from under its insured. Defendant had already effectively sabotaged High Country's defense and left it with no real option but to settle on the terms Claimants offered.

### 3.    Breach of the implied covenant of good faith and fair dealing.

In addition to the above breaches of the express contractual duties to indemnify and defend, High Country alleges that Defendant acted dishonestly and departed from reasonable commercial standards of fair dealing. By these actions, Defendant deprived High Country of its justifiable expectations in entering into a contract of insurance with Defendant.

First and foremost, Defendant reasonably expected that the settlement of disputed claims and liabilities would include a release for the insured. High Country purchased insurance to provide it with protections in the event of a major accident. High Country expected that its insurer would: prioritize protecting its insured; strive to align their interests; and make every reasonable effort, within the bounds of the law and fair advocacy, to secure a release for High Country. Instead, at the first mention of bad faith, Defendant adopted an "every man for himself"

approach, immediately abandoning its insured. In the process of selfishly protecting its own interests, Defendant ignored the advice of its own counsel and overwhelming Montana law without regard to the consequences to High Country.

Defendant's file indicates that, within a few months of the accident, it believed policy limits would have to be paid. Shortly after the accident, Defendant's adjuster informed High Country, directly, that it expected to pay policy limits to settle the matter for High Country in a prompt manner. Defendant's file shows that, in January of 2017, negotiations between Claimants' and Defendant's respective attorneys suggested that a full settlement within policy limits could be achieved. However, Defendant made no attempt at that time to offer policy limits and obtain a release of High Country. High Country reasonably expected that Defendant would act promptly to achieve a resolution that protected its insured when there was an opportunity to do so, and Defendants' failure to act upon that opportunity was commercially unreasonable and damaging to High Country.

High Country also expected that Defendant would fairly investigate and faithfully apply the law in ascertaining and discharging its obligations to its insured. All of the legal advice contained in the files of Defendant's coverage counsel suggests the opposite. Huso accurately and fairly apprised Defendant about

Montana law and explained that Defendant was not under any obligation to surrender policy limits without a release, as Claimants demanded. Yet, within hours, Defendant announced its intent to disregard coverage counsel's advice and accept the Claimants' demand to settle without a release. Defendant's representative instructed Huso to inform High Country of Defendant's intention via a "carefully worded" letter.

Similarly, High Country expected that Defendant would fairly examine coverage issues, including the validity and enforceability of any exclusions Defendant might choose to invoke, before denying coverage. Defendant's coverage counsel was concerned about whether the policy in question complied with the Montana Property and Casualty Insurance Policy Language Simplification Act, but gives no indication that this concern was resolved before Defendant decided to rely on the exclusions and refuse High Country the benefit of $1 million in CGL coverage.

High Country reasonably expected that it would have a fair opportunity to participate in coordinated negotiations and settle all potential liability as part of a single package on the most favorable terms possible, to the extent that a settlement within policy limits could not be achieved. Defendant first raised the possibility of a coordinated settlement, i.e. with High Country contributing funds in addition to

coverage under the policy, on December 1, just days before Defendant accepted the Claimants' offer. This accelerated timeline left High Country without reasonable time or opportunity to try to coordinate settlement efforts. Defendant's rushed effort to settle was unnecessary because it continued to make *Ridley* payments, but prevented any such coordinated settlement.

High Country also reasonably expected that it would not be forced to settle its potential excess liability under threat of a lawsuit financed by its insurer. Whether or not the Claimants and their counsel could or would have proceeded to litigation but for the settlement with Defendant, Defendant's decision to surrender policy limits dramatically reduced Claimants' litigation risk profile.

Finally, High Country reasonably expected that Defendant would provide it with timely and accurate information about its policy and policy terms. At a minimum, High Country expected that Defendant would timely provide a copy of the Policy so High Country could be informed to the same extent as Defendant and its lawyers (or, for that matter, to the same extent to which Defendant informed the Claimant) while momentous decisions about coverage and settlement were under consideration. Contrary to those expectations, Defendant misrepresented the availability of the policy and affirmatively misrepresented that the policy was not available and could not yet be provided. When Defendant did provide the policy

months later and through an intermediary, rather than responding to High Country's request, the policy had been rearranged to emphasize provisions upon which Defendant relied to deny coverage.

## C. Punitive Damages.

Defendant's conduct also demonstrates a reckless indifference to a known risk of harm to High Country and was otherwise actually malicious, warranting imposition of punitive damages in an amount the jury determines sufficient to punish and deter such conduct. §§ 33-18-242(4) and 27-1-221(1)–(2), MCA.

Among other things, Defendant recklessly disregarded the wishes of its insured and the competent legal advice of multiple attorneys it hired who agreed with High Country, and its independent counsel, that settling for policy limits without a release was not compelled by law. Almost immediately after receiving such advice from its own coverage counsel, Defendant made contrary representations to High Country in an effort to justify its decision to protect Defendant's own interests without regard for those of its insured.

Defendant also made fraudulent and malicious misrepresentations about coverage and the status of High Country's policy, including false excuses about why Defendant would not provide a copy of the policy, and by reorganizing the

pages of the policy before providing it to High Country in order to emphasize the exclusion Defendant intended to rely upon to deny CGL coverage.

## IV. THE LEGAL THEORY AND CITATIONS TO AUTHORITY UNDERLYING EACH CLAIM.

### A. Count I - Unfair Claim Settlement Practices.

The unfair claim settlement provisions of the Montana insurance code prohibit certain insurance practices that are deemed by the legislature to be unfair, deceptive, or contrary to public policy. These statutes afford an insured an independent cause of action against its insurer where, *inter alia*, the insurer fails to act in good faith "to effectuate prompt, fair, and equitable settlement of claims…[]," § 33-18-201(6), MCA, and where it "misrepresent[s] facts or insurance policy provisions relating to coverages at issue…." § 33-18-201(1), MCA; *see also* § 33-18-242, MCA (violation of these and other enumerated provisions can sustain independent cause of action).

Relevant to these obligations, and what constitutes a fair and equitable settlement, Montana law has long recognized that an insurance contract places a:

> fiduciary duty on the insurance company to look after the interests of the insured as well as its own, thus requiring it to consider fairly the insured's liability for the excess when evaluating an offer of settlement within policy limits.

*Fowler v. State Farm Mut. Auto. Ins. Co.*, 153 Mont. 75, 79, 454 P.2d 76, 79–80

(1969) (citing *Fetter Livestock Co. v. Nat. Farmers U.P. & Cas. Co.*, 257 F. Supp. 4, 10 (D. Mont. 1966)); *see also Nat. Farmers Union Prop. & Cas. Co. v. O'Daniel*, 329 F.2d 60, 64 (1964); *Gibson v. W. Fire Ins. Co.*, 210 Mont. 267, 682 P.2d 725 (1984) (there is a "fiduciary relationship between the insurer and the insured with resulting duties…" that requires the insurer to "give the insured's interest as much consideration as its gives its own…."); *Guaranty Nat. Ins. Co. v. State Farm Ins. Co.*, 238 Mont. 324, 330, 777 P.2ds 353, 357 (1989) (the duty to settle reflects a "fiduciary duty running from the insurer to the insured" under the policy); *Sell v. Am. Fam. Mut. Ins. Co.*, No. CV09-135-BLG-RFC-CSO, 2011 WL 1042688, at *13 (D. Mont. Jan. 31, 2011) (quoting *Guaranty Nat.*, *supra*); *Thompson v. State Farm Mut. Auto. Ins. Co.*, 161 Mont. 207, 215, 505 P.2d 423, 427–28 (1973), overruled in part by *Watters v. Guaranty Nat. Ins. Co.*, 2000 MT 150, 300 Mont. 91, 3 P.3d 626; *In re Rules of Prof. Cond. and Ins. Imposed Billing Rules and Proc.'s*, 2000 MT 110, ¶ 25, 299 Mont. 321, 2 P. 3d 806 (insurance contracts impose a duty on the insurer to "exercise diligence, intelligence, good faith, [and] honest and conscientious fidelity to the common interests of the parties." (quoting *Jessen v. O'Daniel*, 210 F. Supp. 317, 332 (D. Mont. 1962)).

Informing the insurer's duty to balance its obligations to its insured against its obligations to injured third-party claimants, Montana has a well-developed body

of law describing the circumstances in which an insurer can and must settle a claim for policy limits without conditioning such payment on a release. Where economic damages are not subject to reasonable dispute (i.e. causation and amount are established by clear and convincing evidence, also known as *Ridley* damages) and such damages clearly exceed available coverage, an insurance company *must* promptly pay the limits of available coverage even if that does not include a release for the insured.

In contrast, where undisputed economic damages are less than the available coverage, a settlement for policy limits represents the compromise of a disputed claim and it is appropriate to insist upon a release for the insured in exchange for payment. *See Ridley, supra*; *Watters v. Guaranty Nat. Ins. Co.*, 2000 MT 150, 300 Mont. 91, 3 P.3d 626 (discussing, *inter alia*, *Dairyland, Inc. v. Herman*, 954 P.2d 56 (N.M. 1997) and *Blank v. USAA Property & Cas. Ins. Co.*, 546 N.W.2d 512 (Wis. App. 1996)); *Safeco Ins. Co. of Ill. v. Mont. Eighth Jud. Dist. Ct.*, 2000 MT 153, 300 Mont. 123, 2 P.3d 834; *DuBray v. Farmers Ins. Exch.*, 2001 MT 251, 307 Mont. 134, 36 P.3d 897; *Shilhanek v. D-2 Trucking, Inc.*, 2003 MT 122, 315 Mont. 519, 70 P.3d 721; *Hop v. Safeco Ins. Co. of Ill.*, 2011 MT 215, 361 Mont. 510, 261 P.3d 981; *Lorang v. Fortis Ins. Co.*, 2008 MT 252, 345 Mont. 12, 192 P.3d 186; *Peterson v. St. Paul Fire and Marine Ins. Co.*, 2010 MT 187, 357 Mont. 293, 239 P.3d 904; *State Farm Mut.*

*Auto. Ins. Co. v. Freyer*, 2013 MT 301, 372 Mont. 191, 312 P.3d 403; *Teeter v. Mid-Century Ins. Co.*, 2017 MT 292, 389 Mont. 407, 406 P.3d 464; *see also Burgett v. Safeco Nat. Ins. Co.*, 73 Fed. App'x 254 (9th Cir. 2003); *Ayotte v. Am. Econ. Ins. Co.*, No. CV 09-57-BU-RFC-CSO, 2010 WL 10862740 (D. Mont. Aug. 31, 2010); *Fry v. State Farm Mut. Auto. Ins. Co.*, No. CV-11-04-BU-RKS, 2011 WL 13086565 (D. Mont. Jul. 22. 2011); *Mears v. Safeco Ins. Co. of Ill.*, 888 F.Supp.2d 1048 (D. Mont. 2012); *Crow v. Safeco Ins. Co. of Ill.*, No. CV-12-71-M-DLC, 2012 WL 5430413 (D. Mont. Nov. 7, 2012); *Palmerton v. Wal-Mart Stores*, No. 17-30-H-CCL, 2017 WL 4031432 (D. Mont. Sep. 13 2017); *Harris v. Am. Gen. Life Ins. Co.*, 202 Mont. 393, 658 P.2d 1089 (1983) (discussing the historical rule pre-*Ridley*); *Juedeman v. Nat. Farmers Union Prop. and Cas. Co.*, 253 Mont. 278, 833 P.2d 191 (1992) (same).

A related body of law affirms what the foregoing cases explain, i.e. that general damages do not trigger the special obligations that can sometimes arise under *Ridley* to pay limits without a release, or without litigation to ascertain what damages actually are. General damages are never reasonably certain in amount because they are inherently subjective and cannot be liquidated except by the factfinder by evaluating the evidence developed in the crucible of trial. *See, e.g, Onstad v. Payless Shoesource*, 2000 MT 230, 301 Mont. 259, P.3d 38 (the "law does not set a definite standard by which to calculate compensation for mental pain and

suffering…[,]" so fixing damages "remains within the province of the factfinder…."); *Beaver v. Mont. Dep't of Nat. Res.'s and Conserv.*, 2003 MT 287, 318 Mont. 35, 78 P.3d 857; *Albinger v. Harris*, 2002 MT 118, ¶ 44, 310 Mont. 27, 48 P.3d 711 ("there is no measuring stick by which to determine the amount of damages to be awarded for pain and suffering other than the intelligence of a fair and impartial trier of fact governed by a sense of justice; each case must of necessity depend upon its own peculiar facts."); *Gibson*, 210 Mont. at 291, 682 P.2d at 738–39 (the law fixes "no definite standard or method of calculation" for emotional distress).

Defendant's coverage counsel, Ms. Huso, acknowledged some of the above authorities and their mandates in reminding Defendant of its obligations to High Country in settling the claim, immediately before Defendant disregarded Huso's advice and chose to settle its own liability and leave High Country exposed.

On November 29, 2017, Huso advised Defendant that she "disagree[d] with Mr. Edwards' interpretation of *Ridley/DuBray*…" and the other authorities cited in support of his demand for payment of policy limits without a release for High Country. Huso correctly explained to Defendant that:

> No Montana court has ever required an insurer to advance pay general damages without a full and final release of its insured. The duty to advance pay prior to final settlement has been limited to those cases in which

> the insured's liability is reasonably clear and the third-party claimant's special damages are not reasonably in dispute.

"Unlike medical expenses and wage loss," Huso continued, uncertain damages like the ones making up most of Edwards' demand are "wholly subjective in nature and not plainly ascertainable in amount…" as is required to trigger an insurer's limited duty under *Ridley* to pay policy limits without conditioning that payment on a release for its insured.

Huso concluded, again correctly, that "[t]here is no authority" for Edwards' assertions that UFG "owes a greater duty to a third-party claimant than its own insured, or that the failure to pay limits without a release under these circumstances exposes UFG to significant bad faith/UTPA liability."

Huso's advice to the Defendant, and the authorities she cited, are directly contrary to Defendant's position as stated in its "carefully worded" December 1, 2017 letter to High Country, advising that Defendant was considering settling (as it ultimately did) without a release for High Country because Defendant "believes it is obligated to pay the $3,00,000.00 policy limits in order to comply with the Montana Supreme Court's direct in *Watters/Shilhanek*."

None of the above-cited cases extend the limited duty to settle without a release, under *Ridley* and its progeny, to claims where the potential excess damages

are general and/or punitive damages. Indeed, the rationales of all the above authorities are clear that there is no duty to settle without a release under those circumstances. The mere possibly that a jury might award substantial general damages does not present the same risk of coercive financial pressure if payment for such damages is not immediately surrendered. And, general and punitive damages cannot be predicted with any kind of certainty prior to trial even when liability is clear.

Moreover, although the MUTPA imposes a duty on insurers to effectuate a fair settlement once liability has become reasonably clear, § 33-18-201(6), MCA, no Montana court has ever held that this duty is analogous to *Ridley* or otherwise compels an insurer to surrender policy limits because it fears that a jury might award substantial general damages. Where, as here, the bulk of the damages are general and punitive damages, nothing in § 33-18-201(6), MCA, precludes an insurer from insisting upon a release for its insured in exchange for settling the disputed portion of the claim, i.e. those damages not subject to *Ridley*, particularly when they represent more than 90% of the demand.

In addition, Defendant breached its statutory duties under § 33-18-201(1) and (6), MCA, by: misleading High Country about which coverages were in play; failing to respond to repeated requests for the policy language; and then relying on

exclusions in the late-provided policy to deny additional coverage that might have enabled a settlement with a release. The exclusions upon which Defendant relied to deprive High Country of coverage were unenforceable. *See Mont. Petroleum Tank Release Comp. Bd. v. Crumleys, Inc.*, 2008 MT 2, ¶¶ 53–54, 341 Mont. 33, 174 P.3d 948 (deeming void policy provisions that failed to identify the provision in a table of contents or a "special notice" section of important provisions in the policy, in "clear violation" of the Montana Property and Casualty Insurance Policy Language Simplification Act, § 33-15-337(2)). Defendant's coverage counsel identified this defect just days before Defendant rejected High Country's tender of the claim under its commercial general liability coverage.

### B. Count II - Breach of Contract.

#### 1. Breach of the duty to indemnify based on improper denial of CGL coverage.

The Montana Property and Casualty Insurance Policy Language Simplification Act imposes certain technical and substantive requirements on insurers to provide policy information to Montana insureds in an organized and decipherable way.

Among other things, the Act requires that property and casualty policies "must include a table of contents and notice section of important provisions." § 33-15-337, MCA. Provisions that fail to comply with this requirement are

contrary to Montana law and, as a matter of public policy, may not be invoked by an insurer to deny coverage. *See Crumley's*, *supra* (endorsement containing a notice provision not set forth in a table of contents was invalid); *see also Belgrade Educ. Ass'n v. Belgrade School Dist.*, 2004 MT 318, 324 Mont. 50, 102 P.3d 517 (contract provisions that violate express statutes are contrary to public policy and void as a matter of law); *MPH Co. v. Imagineering, Inc.*, 243 Mont. 342, 792 P.2d 1081 (1990) (courts will not enforce illegal contracts or provisions).

As for the ambiguity in the "Multiple Liability Coverages Limitation," Montana law liberally construes ambiguous language in insurance contracts against the insurer and in favor of coverage. *Mountain West Farm Bureau v. Neal*, 169 Mont. 317, 322, 547 P.2d 78, 82 (1976).

Although High Country is unaware of an extant body of law on this subject in Montana, many courts have also recognized an equitable limitation on an insurer's right to rely on self-serving policy language that it did not provide to the insured. *See* 78 ALR.4th 9 (1990) (surveying cases related to an insurer's "duty, and effect of its failure, to provide insured or payee with copy of policy…" including cases where the "insurer could not deny coverage based on limitations or exclusions expressed in the policy" after failing to provide the insured with timely and appropriate documentation of the policy terms).

### 2. Breach of the duty to defend.

Defendant had a duty to defend High Country. That duty included an obligation, in the present circumstances, not to pay policy limits to protect its own interests without obtaining a release for High Country. Through the actions described above, Defendant breached this duty by paying policy limits without obtaining a release for High Country, and by the manner in which it did so.

### 3. Breach of the implied covenant of good faith and fair dealing.

Insurance companies that choose to do business in the state of Montana "have a duty of good faith when dealing with their insureds[,]" which is both implicit in and exists independent of the insurance contract. *Lipinski v. Title Ins. Co.*, 202 Mont. 1, 15, 655 P.2d 970, 977 (1982); *Stephens v. Safeco Ins. Co. of Am.*, 258 Mont. 142, 145, 852 P.2d 565, 567–68 (1993); *Thomas v. Northwestern Nat. Ins. Co.*, 1998 MT 343, ¶¶ 41–43, 292 Mont. 357, 973 P.2d 804.

The implied covenant of good faith and fair dealing requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." § 28-1-211, MCA. The implied covenant of good faith and fair dealing can be breached by *either* dishonesty *or* commercially unreasonable conduct that deprives the other contracting party of its justifiable expectations in contracting.

*May v. ERA Landmark Real Estate of Bozeman*, 2000 MT 299, ¶ 48, 302 Mont. 326, 15 P.3d 1179.

As Judge Christensen summarized earlier this case, an insurer's limited duty to pay policy limits without a release where *Ridley* damages clearly exceed coverage "does not mean that *any* obligation to seek a release of liability for an insured defies public policy or that an insured cannot have a reasonable expectation for negotiation of a release when policy limits are *not* clearly implicated." Doc. 12, p. 16 (discussing *Ridley* and *Watters*, *supra*). "Between *Watters* and *Ridley*," the Court explained, "there appears to be an area of the law which could be navigated to justify a reasonable expectation that [the insurer] would negotiate a release for [its insured] before settling with the claimants...." *Id.* at 18. "Neither *Watters* nor *Ridley* would be violated if [the insurer] had negotiated for a release after paying the undisputed [economic] damages..." *Id.* Thus, in addition to the cause of action for statutory unfair claim handling, Defendant's decision to surrender policy limits without securing a release for High Country "could support a breach of contract claim for the failure of [Defendant] to observe reasonable commercial standards of fair dealing in the trade." *Id.*

Judge Christensen's conclusions are consistent with the independent analysis, prior to Defendant's decision to settle, offered by insurance defense

counsel (Pagnotta) and Defendant's own coverage counsel (Huso). Defendant's decision to settle without a release for its insured, based on a professed belief that it was "obligated" to do so under Montana law, in the face of overwhelming contrary legal authority and immediately after receiving contrary advice, was also actually dishonest and/or commercially unreasonable and amounted to a breach of the implied covenant of good faith and fair dealing.

## C. Punitive damages.

Punitive damages are awardable if the jury finds Defendant liable under the MUTPA tort claim and, by clear and convincing evidence, that Defendant is guilty of actual fraud or actual malice. § 27-1-221, MCA (general punitive damages statute); § 33-18-242(3), MCA (exemplary damages may be assessed in MUTPA cases in accordance with § 27-1-221, MCA); *Lorang*, ¶¶ 90–93.

## D. Attorneys' fees and costs.

High Country is entitled to an award of its attorney's fees and costs pursuant to the insurance exception because High Country was compelled to commence and assume the burdens of legal action in order to obtain the full benefits it was entitled to under its policy. *Mountain West Farm Bureau Mut. Ins. Co. v. Brewer*, 2003 MT 98, ¶ 36, 315 Mont. 231, 69 P.3d 651; *Cramer v. Farmers Ins. Exch.*, 2018 MT 198, ¶ 27, 392 Mont. 329, 423 P.3d 1067.

## E.    Pre and post-judgment interest.

High Country is entitled to an award of post-judgment interest on any judgment it recovers, until paid, pursuant to § 25-9-205, MCA.

High Country is additionally entitled to an award of pre-judgment interest on the portion of its damages capable of being made certain by calculation pursuant to § 27-1-210 and § 27-2-211, MCA, including but not limited to the cash amount High Country paid to secure a release for itself (described in Section V(1), below). In addition or in the alternative, High Country may be entitled to an award of pre-judgment interest, in the discretion of jury and if it finds actual malice or fraud, pursuant to § 27-1-212, MCA.

## V.    COMPUTATION OF DAMAGES.

The following sets forth a preliminary itemization of High Country's claimed damages to date, based on information reasonably available at this time:

1. $1,275,000.00 – cash payment for settlement (including $1,000,000.00 in withheld CGL coverage);

2. Value of the assignment of claims pursuant to the settlement. The value of that assignment is presently unknown;

3. Attorneys' fees and costs;

4. Pre and post-judgment interest; and

5. Punitive damages in an amount to be determined at trial.

## VI. THE PENDENCY OR DISPOSITION OF ANY RELATED STATE OR FEDERAL LITIGATION.

None.

## VII. PROPOSED ADDITIONAL STIPULATIONS OF FACT NOT INCLUDED IN THE STATEMENT OF STIPULATED FACTS, AND THE PARTIES' UNDERSTANDING AS TO WHAT LAW APPLIES.

High Country has no additional proposed stipulated facts.

Montana law governs.

## VIII. PROPOSED DEADLINES RELATING TO JOINDER OF PARTIES OR AMENDMENT OF PLEADINGS.

High Country proposes June 1, 2019 as the deadline for amendments to the pleadings and for joinder.

## IX. IDENTIFICATION OF CONTROLLING ISSUES OF LAW SUITABLE FOR PRETRIAL DISPOSITION.

High Country does not anticipate that there are any controlling issues of law suitable for pretrial disposition.

That said, there are two issues that High Country wishes to address.

### A. The role that Gardner and Tierney will play in this case.

Trent Gardner and Jeff Tierney are counsel of record for plaintiff. Defendant has identified them as potential witnesses. Even before that, plaintiff's counsel had

concluded that Gardner and Tierney are likely to be witnesses at trial. Accordingly, the role that they can play in pretrial proceedings should be discussed. Plaintiffs address that under Section XIII, below.

**B.** **The defendant's numerous alleged controlling issues of law to be decided prior to trial.**

Defendants' preliminary pretrial statement has identified ten issues of law that it believes are controlling and suitable for pretrial disposition. It is difficult for plaintiff to respond completely given the lack of context and specificity. It appears to plaintiff, however, that many of these supposedly controlling issues of law are, in fact, simply broad platitudes that would not necessarily dispose of any particular issue in this case. Instead, it appears that the Defendant would ask the Court to issue advisory rulings, perhaps as guidance for carriers in future cases. But, it appears that many of those platitudes, even if this Court decided to rule upon them, would not dispose of this case.

And, many of those "issues" cannot be decided in a vacuum as a generalized statement but, instead, are dependent upon the specific facts, circumstances, and context of this case. As such, they are not suitable for pretrial disposition unless and until a fully supported summary judgment motion is presented establishing that there are no disputed questions of material fact bearing on these various issues of law.

Plaintiff is dubious that any such motion would present purely legal, as opposed to factual, issues. Unless it depends **entirely** upon interpretation of legal precedent, reasonableness is usually considered a factual issue, uniquely within the province of the jury.

## X.   INDIVIDUALS WITH INFORMATION THAT MAY BE USED IN PROVING OR DENYING ANY PARTY'S CLAIMS OR DEFENSES.

At this time, High Country believes the following individuals have information relevant to the parties' claims or defenses:

1. Derek Swenson, Belgrade, Montana, c/o Goetz, Baldwin & Geddes, P.C., P.O. Box 6580, Bozeman, Montana. Derek has information related to the underlying accident and insurance claim, the handling of the claim, Defendant's action to settle out from under High Country without obtaining a release and subsequent efforts to obtain a settlement of the underlying matter.

2. Darin Swenson, Belgrade, Montana, c/o Goetz, Baldwin & Geddes, P.C., P.O. Box 6580, Bozeman, Montana. Darin has information related to the underlying accident and insurance claim, the handling of the claim, Defendant's action to settle out from under High Country without

obtaining a release and subsequent efforts to obtain a settlement of the underlying matter.

3. Debbie Swenson, Belgrade, Montana, c/o Goetz, Baldwin & Geddes, P.C., P.O. Box 6580, Bozeman, Montana. Debbie has information related to the underlying accident and insurance claim, the handling of the claim, Defendant's action to settle out from under High Country without obtaining a release and subsequent efforts to obtain a settlement of the underlying matter.

4. Jack Swenson, Belgrade, Montana, c/o Goetz, Baldwin & Geddes, P.C., P.O. Box 6580, Bozeman, Montana. Jack has information related to the underlying accident and insurance claim, the handling of the claim, Defendant's action to settle out from under High Country without obtaining a release and subsequent efforts to obtain a settlement of the underlying matter.

5. Nicholas Pagnotta, Williams Law Firm, 235 East Pine, Missoula, Montana, 59807-9440, 406 721-4350. Mr. Pagnotta was insurance defense counsel and is believed to have knowledge regarding the underlying claim and events, as well as Defendant's handling of the claim and the decision to settle without a release of High Country.

6. Mary Farjadi, Casualty Claims Specialist, United Fire & Casualty Co., 7301 N. Federal, Suite 200, Westminster, CO 80030, mfarjadi@unitedfiregroup.com. It is believed Ms. Farjadi has knowledge regarding Defendant's handling of the insurance claim and the decision to settle without a release of High Country.

7. Katherine S. Huso, Matovich Keller Murphy PC, 2812 1st Ave. N., Suite 225, Billings, Montana 59103-1098, 406 252-5500. It is believed Ms. Huso has knowledge regarding Defendant's handling of the insurance claim, investigation and decision of coverage questions, and the decision to settle without a release of High Country.

8. Jesse Myers, Murphy Myers PLLC, 2718 Montana Ave, Suite 220, Billings, MT 59101, 406-732-6868, was employed by Matovich Keller Murphy PC. It is believed that Mr. Myers has knowledge regarding Defendant's handling of the insurance claim and investigation and decision of coverage questions.

9. Neal Scharmer, Vice President and General Counsel, United Fire & Casualty Co., 118 Second Avenue SE, Cedar Rapids, Iowa 52407-3909, 800-343-9131. It is believed Mr. Scharmer has knowledge regarding

Defendant's handling of the insurance claim and the decision to settle without a release of High Country.

10. Monica Bohanon, Claims Supervisor, United Fire & Casualty Co., 7301 North Federal Boulevard, Suite 200, Westminster, Colorado 80030, 800-877-5002. It is believed Ms. Bohanon has knowledge regarding Defendant's handling of the insurance claim and the decision to settle without a release of High Country.

11. Other representatives of Defendant, identified in the documents or in discovery, who were involved in or privy to the decisions at issue in this case.

12. Chris Edwards – Edwards, Frickle & Culver, 1648 Poly Dr. #206, Billings, Montana 59102, 406 256-8155. Mr. Edwards may have knowledge about the underlying claim (including but not limited to the nature, amount, and proof of damages claimed), settlement negotiations, and the value of the claims assigned as partial consideration for the settlement.

13. Jeffrey J. Tierney and Trent M. Gardner, Goetz, Baldwin & Geddes, P.C., P.O. Box 6580, Bozeman, Montana. Mr. Tierney may testify regarding the events and communications leading up to United Fire's

settlement without obtaining a release of High Country. Mr. Gardner may testify regarding settlement negotiations with the Edwards Firm after United Fire's settlement.

14. Representatives of the Estate of Ms. Fogerty and Ms. Elgen, care of the Edwards Law Firm. These persons, identities presently unknown, may offer testimony regarding their settlement position, at various times, on the underlying claims.

15. Any witnesses identified by Defendant.

## XI.  THE SUBSTANCE OF ANY INSURANCE AGREEMENT THAT MAY COVER ANY RESULTING JUDGMENT.

High Country is aware of none at this time.

Defendant has said "none" also. But, many times insurance companies do, in fact, obtain insurance coverage against claims of extra-contractual liability.

## XII.  THE STATUS OF ANY SETTLEMENT DISCUSSIONS AND PROSPECTS FOR COMPROMISE OF THE CASE.

No substantive settlement discussions have taken place to date. Settlement discussions may, perhaps, be appropriate after the case progresses.

## XIII. SUITABILITY OF SPECIAL PROCEDURES.

High Country does not anticipate the need for any special procedures at this time except for some guidance as to the role of Mr. Gardner and Mr. Tierney.

Mr. Gardner and Mr. Tierney are likely witnesses at trial. This implicates

two rules with respect to their ongoing roles in this case.

First, Rule 3.7 of the Montana Rules of Professional Conduct, reads as

follows:

**Rule 3.7  Lawyer as witness**

(a)    A lawyer shall not act as advocate at a trial in which
the lawyer is likely to be a necessary witness unless:

    (1)    the testimony relates to an uncontested issue;

    (2)    the testimony relates to the nature and value of
legal services rendered in the case; or

    (3)    disqualification of the lawyer would work subst-
antial hardship on the client.

(b)    A lawyer may act as advocate in a trial in which
another lawyer in the lawyer's firm is likely to be    called
as a witness unless precluded from doing so  by  Rule  1.7
or Rule 1.9.

This Court's Local Rule 83.5 reads as follows:

**83.5, Attorney as Witness.** If an attorney representing
any party is examined as a witness in a case and gives
testimony on the merits, the attorney may not argue the
merits of the case, either to the Court or jury, except by
permission of the Court, and as limited by the Court.

The United States District Court for the District of Montana has applied

those rules. *See Nelson v. Hartford*, 2012 WL 761965 (D. Mont., March 8, 2012);

*Pumphrey v. Cinc. Ins. Co.*, No. CV-05-14-BLG-CSO (D. Mont., March 9, 2007).

High Country agrees that Mr. Gardner and Mr. Tierney may not, going forward:

1. Act as trial counsel (including sitting at counsel's table);

2. Argue the merits of the case to this Court, including pretrial (such as by orally arguing a motion or signing a motion/brief);

3. Take any depositions; or

4. Otherwise participate in the case in a way that would reveal their role as counsel to the jury.

But, these Rules, either alone or combined, do not require either: (1) disqualification of Mr. Baldwin (or other lawyers from the same firm); or (2) that Mr. Gardner and Mr. Tierney refrain from all activity in this case.

First, Rule 3.7(b) specifically does not extend disqualification to other members of Mr. Gardner's and Mr. Tierney's firm. While other rules may do so, Defendant has not suggested those other rules apply. High Country does not believe they do. Mr. Baldwin and other members of the Goetz firm may act as trial counsel even if Mr. Gardner and Mr. Tierney testify.

Second, High Country believes that Mr. Gardner and Mr. Tierney may still:

1. Help with "behind-the-scenes" activities that do not reveal their "dual

role" to the jury, such as:

a.  Assisting with pretrial and trial strategy;

b.  Legal research;

c.  Assisting in drafting (but not signing) written discovery requests and responses, motions, and briefs; and

d.  Attending depositions to assist (but not making any comments or asking any questions on the record).

High Country would like to discuss these matters at the pretrial conference so that its counsel understands, and can thus comply with, this Court's expectations in this regard. Frankly, counsel is not certain whether Mr. Gardner and Mr. Tierney's names should be on the counsel block for filings and discovery matters. They are happy to remove their names (including replacing any documents that have already been filed) if the Court so requires.

DATED this 27th day of March, 2019.

**GOETZ, BALDWIN & GEDDES, P.C.**

ATTORNEYS FOR PLAINTIFF
HIGH COUNTRY PAVING, INC.

**/s/Robert K. Baldwin**
Robert K. Baldwin
Trent M. Gardner
Jeffrey J. Tierney