Robert K. Baldwin
Trent M. Gardner
Jeffrey J. Tierney
**GOETZ, BALDWIN & GEDDES, P.C.**
35 North Grand
P.O. Box 6580
Bozeman, MT  59771-6580
Phone: (406) 587-0618
Fax:     (406) 587-5144
Email:  rbaldwin@goetzlawfirm.com
          tgardner@goetzlawfirm.com
          jtierney@goetzlawfirm.com

Attorneys for High Country Paving, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| HIGH COUNTRY PAVING, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED FIRE & CASUALTY CO., <br><br> Defendant. | Cause No. 9:18-cv-00163-DWM <br> Hon. Donald W. Molloy <br><br> **FIRST AMENDED COMPLAINT and DEMAND FOR JURY TRIAL** |

High Country Paving, Inc. states its claims as follows:

### PARTIES

1.     Plaintiff High Country Paving, Inc. ("High Country") is a Montana corporation. High Country is a family-owned business that provides asphalt paving and maintenance services.

2. Defendant United Fire & Casualty Co. ("United Fire") is an Iowa corporation. It is an insurance company that does business in Montana.

## VENUE AND JURISDICTION

3. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1441 (removal of qualifying state court action based on diversity of citizenship).

4. United Fire is personally subject to this Court's jurisdiction because it conducts business in the State of Montana.

5. Venue is proper pursuant to § 25-2-122(2)(c), MCA, by operation of District Court Local Rule 3.2(b) and 28 U.S.C. § 1441(a), because United Fire maintains a registered agent in Missoula County and this action was properly initiated in Montana state court in Missoula County prior to removal. All parties have consented to venue pursuant to District Court Local Rule 3.2(c)(3).

## BACKGROUND AND GENERAL ALLEGATIONS

6. High Country purchased a liability insurance policy from United Fire (Policy No. 60436013, hereinafter the "Policy").

7. The Policy included three coverages:

A. Commercial general liability coverage (in the amount of $2 million, with a $1 million per-occurrence limit);

B. Commercial automotive liability coverage ($1 million); and

C. Commercial umbrella coverage ($2 million).

8. In August 2016, during the policy period, one of High Country's employees was involved in an accident while operating an insured High Country vehicle. While the vehicle was under way, a loaded equipment trailer came unhitched and collided with another vehicle, killing its driver, Christine Fogerty, and seriously injuring her passenger, Mary Elgen.

9. High Country promptly notified United Fire of the incident.

10. Ms. Elgen and Ms. Fogerty's estate (together, the "claimants") hired the law firm of Edwards Frickle & Culver ("Edwards") to represent them.

11. On September 15, 2016, Edwards requested that United Fire provide information about the Policy, including a copy of the declaration pages.

12. In October 2016, United Fire retained Katherine Huso ("Huso") at Matovich Keller Murphy, P.C., to advise United Fire on coverage issues.

13. On November 3, 2016, United Fire, through Huso, provided Edwards with the requested declaration pages.

14. On November 8, 2016, Edwards requested a complete copy of the Policy.

15. Approximately a week later, United Fire, through Huso, responded to Edwards' request and provided a certified copy of the Policy, including the

automotive, umbrella and commercial general liability coverage sections but omitting the schedule of covered vehicles for the automotive section.

16.     United Fire claim supervisor Monica Bohanon wrote to High Country about the claim on November 30, 2016. Her letter:

A.      Advised that United Fire was High Country's "Commercial General Liability carrier" and that High Country "carr[ied] a $1,000,000 per occurrence liability limit…" and had "an Umbrella Policy with a $2,000,000 per occurrence limit." Despite the nature of the accident, the letter made no mention of High Country's commercial automotive coverage;

B.      Advised that United Fire perceived a risk of exposure to liability in excess of coverage, but "this appears unlikely…";

C.      Acknowledged United Fire's "obligation to advise [High Country] of potential limit issues that may arise throughout the remaining investigation."; and

D.      Advised High Country to engage independent counsel at its own expense because "[w]hile it is always our intent to settle claims within the policy limits we wanted to notify you now of the concern that if this case should go to trial, there is always a possibility of an excess

verdict over your policy limits."

17.     United Fire prepared and possessed certified copies of High Country's Policy certified on October 12, 2016 (automotive, umbrella and commercial general liability) and December 27, 2016 (automotive).

18.     High Country provided a certified copy of High Country's Policy to its coverage counsel in 2016.

19.     United Fire provided Edwards with additional Policy information, including the previously-omitted schedule of covered vehicles and a certified copy of the automotive coverage section, in January 2017.

20.     Huso and Edwards conferred about the claim and prospects for settlement in early 2017. Huso advised United Fire that it appeared the claim could be settled within the $3 million acknowledged limits. At that time, United Fire had increased its reserves on the claim to $3 million, but, United Fire did not make a policy limits offer or otherwise attempt to settle with the claimants at that time.

21.     On July 12, 2017, High Country, through its independent counsel, reached out to United Fire at the contact information listed on United Fire's November 30, 2016 letter to request a copy of the Policy. United Fire did not respond.

22.     The following week, High Country was advised that the claim had

been reassigned to casualty claims specialist Mary Farjadi.

23.     High Country repeated its request for a copy of the Policy in an email to Ms. Farjadi on July 25, 2017. Farjadi responded but did not provide a copy of the Policy as requested. Instead, she directed High Country's independent counsel to speak to Nick Pagnotta at the Williams Law Firm, who, Farjadi explained, is "our defense counsel on this claim."

24.     United Fire did not explain why the attorney whom United Fire hired, ostensibly to defend High Country against the potential tort claims, would have a copy of the Policy or would be involved in coverage issues or determinations.

25.     Nonetheless, High Country contacted Mr. Pagnotta who responded that United Fire had not provided him with a copy of the Policy either.

26.     On August 11, 2017, High Country's independent counsel contacted Ms. Farjadi again, reiterating High Country's request for a copy of its Policy. Farjadi falsely represented that she was unable to provide High Country with its Policy because a certified copy of the policy was not yet available.

27.     On November 1, 2017, Mr. Pagnotta notified High Country that Edwards had issued a demand letter on behalf of the claimants. He provided a copy of the letter which was dated October 31, 2017.

28.      Edwards' demand letter made various allegations of negligent vehicle

operation as well as negligent maintenance, training and supervision.

29.    Edwards demanded payment of "High Country Paving's Policy Limits of $3,000,000.00…."

30.    Edwards' letter further explained: "[i]mportantly, this limits demand does not include a release for High Country Paving…."

31.    Edwards' letter described the claimants' alleged economic damages, including future damages, and totaled them as $1,549,881.25, approximately half of the "limits demand."

32.    The letter then broke down the claimants' economic damages by category, specifying that the $1,549,881.25 figure included:

A.    $609,486.36 for Ms. Fogerty's estimated lost *future* income, if she had lived;

B.    $595,342.91 for the estimated cost of *future* assisted-living arrangements for Ms. Elgen *and* her spouse, without any offset for their prior housing costs or for any services provided to Mr. Elgen, and assuming Ms. Elgen lives to be 91 years old;

C.    $61,060.89 for the cost of assisted-living arrangements for Ms. Elgen *and* her spouse as of the date of the demand, again without any kind of offset for living expenses these services replaced and without

particularizing between the injured claimant and her spouse; and

D.     $283,991.09 for Ms. Elgen's actual medical expenses as of the date of the demand.

33.     Edwards' letter explained that, other than these alleged economic damages, the claimants were also seeking compensation for non-economic damages like pain and suffering and loss of consortium, to which Edwards did not attempt to assign a value.

34.     Edwards' letter also indicated the claimants would seek punitive damages.

35.     United Fire and Huso knew and understood that the special damages claimed by the demand totaled only $1,549,881.25, of which less than $350,000 were not speculative future damages.

36.     As of the time of the demand, and after almost four months of waiting and multiple unanswered requests to United Fire, High Country was still without a copy of its Policy. So, High Country asked Mr. Pagnotta again on November 1. This time he was able to provide the parts of the Policy addressing the automotive and umbrella coverages, but not the commercial general liability coverage referenced in United Fire's original letter of November 30, 2016.

37.     Although United Fire had already prepared and possessed certified

copies of the sections of High Country's Policy describing these coverages, dated October 12, 2016 (automotive and umbrella) and December 27, 2016 (automotive), United Fire prepared a new certified copy for High Country. The copy High Country received was certified on September 5, 2017, almost two months before High Country received it in early November. United Fire still did not provide a certified copy of the CGL Policy, despite the fact that it had provided a certified copy of its CGL Policy to Edwards and its coverage counsel in late 2016.

38.     On November 9, 2017, after reviewing Edwards' demand, High Country advised Mr. Pagnotta that it was supportive of any potential settlement United Fire could achieve within policy limits so long as it fully resolved the dispute. However, High Country objected to Edwards' proposal that United Fire pay policy limits without a release for High Country.

39.     Also on November 9, High Country directly advised United Fire, care of Ms. Farjadi, that High Country objected to payment of policy limits without a release.

40.     High Country's November 9 letter to United Fire also explained that Edwards' demand included various allegations of negligence unrelated to vehicle operation (e.g. negligent training, maintenance, and supervision) which appeared to implicate High Country's commercial general liability coverage, although that part

of the Policy had still not been provided. High Country therefore asked United Fire to make available all of its coverage, including the commercial general liability coverage, in order to secure a full settlement with a full release.

41.     Mr. Pagnotta responded to Edwards' demand letter on November 14, 2017. His letter indicated he agreed with High Country's independent counsel that it would be inappropriate for United Fire to settle its own liability on the terms Edwards offered while leaving High Country exposed. He explained that:

A.     United Fire would advance all undisputed expenses caused by the accident as they arose, as required by *Ridley v. Guar. Nat. Ins. Co.*, 286 Mont. 325, 951 P.3d 987 (1997).

B.     But, "this does not appear to be a case where policy limits should be tendered without a release of our client…" because,

C.     Under *Watters v. Guar. Nat'l Ins. Co.*, 2000 MT 150, 300 Mont. 91, 3 P.3d 626, *Ridley* damages can sometimes exhaust policy limits, in which case they must be paid without a release,

D.     But, under *Dubray v. Farmers Ins. Exch.*, 2001 MT 251, 307 Mont. 134, 36 P.3d 897, "[g]eneral damages and alleged punitive damages are usually not included in the category of damages required to be advance paid."

E.     Thus, many of the damages sought by Edwards' demand were "debatable" and fell outside *Ridley*, so there was no basis to pay policy limits without a release as Edwards demanded.

42.     In fact, as Edwards' demand letter set forth in detail, only a small fraction of the claimed damages represented undisputed special damages, like past medical expenses and lost income, that could trigger *Ridley* obligations. Ms. Elgen's medical expenses, totaling $283,991.09, were less than ten percent (10%) of Edwards' $3 million demand. The remaining claimed damages consisted of uncertain future special damages (things like Ms. Fogerty's lost income and Ms. Elgen's future care needs) and general non-economic damages.

43.     United Fire was already paying the claimants' *Ridley* damages as they incurred economic damages related to the accident and Edwards tendered them to United Fire for payment

44.     In light of his explanation that paying the full $3 million demand *without* a release for High Country would be inappropriate, Mr. Pagnotta's November 14 letter counter-offered to settle for the same amount *with* a full release for High Country.

45.     On November 17, Pagnotta forwarded High Country a copy of the Policy section describing High Country's commercial general liability coverage.

Contrary to the suggestion of United Fire's November 30, 2016 letter, the Policy contained a provision (captioned "Aircraft, Auto or Watercraft") that arguably excluded coverage for negligent maintenance, training and supervision claims related to an automotive accident covered by the commercial automotive policy.

46.    The "Aircraft, Auto or Watercraft" exclusion had not been previously provided to High Country.

47.    Although United Fire had already prepared and possessed certified copies of the section of High Country's Policy describing this coverage, dated October 12, 2016, United Fire prepared a new certified copy for High Country. The copy High Country received was certified on November 17, 2017.

48.    Each certified copy of the Policy (or section of the Policy) contained a sworn certification that the attached document was a true and correct copy. Notwithstanding that certification, the certified copy of the CGL coverage section dated November 17, 2017 (provided to High Country) was different than the earlier version certified on October 12, 2016 (provided to Huso). United Fire shuffled the pages in High Country's copy, apparently to give prominence to an endorsement containing an exclusion captioned "Multiple Liability Coverages Limitation," which had been moved toward the front of the document, apart from all of the other policy endorsements, just after the declaration pages and before the body of

the insuring agreement.

49.     On November 27, 2017, Edwards responded to Pagnotta refusing the counter-offer. Edwards renewed the original demand for $3 million without a release for High Country, subject to a ten-day response deadline. Edwards threatened a bad faith action against United Fire if the offer was not accepted.

50.     On the same date, Edwards separately wrote to High Country's independent counsel demanding an additional $2.5 million from High Country, on top of the $3 million demanded from United Fire under High Country's Policy.

51.     On November 29, Huso, United Fire's coverage counsel, wrote to United Fire, echoing Pagnotta's analysis about Edwards' overreach of *Ridley*. Huso advised United Fire that:

A.     She "disagree[d]" with Edwards' interpretation of United Fire's obligations under *Ridley* and its progeny;

B.     "No Montana court has ever required an insurer to advance pay general damages without a full and final release of its insured."

C.     "The duty to advance pay prior to final settlement has been limited to those cases in which the insured's liability is reasonably clear and the third-party claimants' special damages are not reasonably in dispute."

D.     *Ridley* obligations are not triggered by damages that are "wholly

subjective in nature and not plainly ascertainable in amount."

E.  "There is no authority supporting [Edwards'] assertion that UFG owes a greater duty to a third-party claimant than its own insured, or that the failure to pay limits without a release under these circumstances exposes UFG to significant bad faith/UTPA liability."

F.  Edwards' legal authorities for demanding payment of policy limits without a release were limited to situations involving "**medical expenses** that exceeded the policy limits" (emphasis in original).

52.  Less than three hours after Huso delivered her analysis, United Fire Vice President and General Counsel, Neal Scharmer, responded, writing: "I think we need to advise the insured that we will likely accept the demand of payment of limits and solicit its willingness to offer additional sums. Those letter [sic] will need to be carefully worded."

53.  The next day, November 30, 2017, Huso asked another attorney at the Matovich firm, Jesse Myers, to do some further research on the CGL coverage issue and the enforceability of the exclusions United Fire had identified as a possible basis to deny High Country's demand under its CGL coverage. Myers questioned whether the Policy complied with the Montana Property and Casualty Insurance Policy Language Simplification Act, specifically including the

requirement of § 33-15-337(2), MCA, that the policy "must include a table of contents and notice section of important provisions." Myers alerted Huso to the Montana Supreme Court's decision in *Montana Petroleum Tank Release Compensation Board v. Crumley's, Inc.*, 2008 MT 2, 341 Mont. 33, 174 P.3d 948, which prohibited an insurer from denying coverage based on policy provisions that failed to comply with this statutory requirement.

54.    High Country's Policy did not contain the required table of contents or "notice section of important provisions," let alone a table or notice section that identified or emphasized the "Aircraft, Auto or Watercraft" or "Multiple Liability Coverages Limitation" exclusions.

55.    On December 1, 2017, less than a week before Edwards' deadline, United Fire responded, through Huso, to High Country's November 9, 2017 letter. United Fire declined to make available the commercial general liability coverage, principally citing the "Aircraft, Auto or Watercraft" exclusion in the commercial general liability policy that High Country had only just received from Mr. Pagnotta, as well as the "Multiple Liability Coverages Limitation" endorsement that United Fire had moved towards the front of the Policy.

56.    Ms. Huso's December 1 letter also:

A.    Stated that United Fire was considering accepting Edwards' renewed

offer—the same one that Pagnotta and Huso, United Fire's coverage counsel, had each just explained was improper and contrary to law;

B.　　Invited High Country "to consider a contribution of its own toward settlement," which it viewed as a matter "solely within the discretion of High Country Paving[;]" and

C.　　Explained that, if it agreed to pay the claimants' $3 million demand without a release, United Fire would continue to provide High Country with a defense.

57.　　High Country wrote back to United Fire and Ms. Huso on December 5, 2017, reiterating its position that acceding to Edwards' demand without a release was contrary to law and would be harmful to High Country.

58.　　On December 8, 2017, High Country's independent counsel spoke to United Fire's coverage counsel, Ms. Huso, regarding the settlement offer and United Fire's suggestion that High Country contribute toward settlement. In that conversation:

A.　　Huso stated United Fire was planning to accept Edwards' $3 million settlement offer that afternoon;

B.　　High Country's counsel explained that Edwards had made a separate demand on High Country and, if United Fire intended to settle the

same day, it was not feasible for High Country to participate; and

C.     High Country reiterated its disagreement that it was necessary or appropriate for United Fire to pay the claimants' unliquidated general damages without a release.

59.     Having thus sidelined Mr. Pagnotta after he expressed his disagreement with what United Fire was doing, United Fire had its coverage counsel write to Edwards later that afternoon and accept the offer to settle United Fire's own exposure in exchange for the limits of High Country's Policy, without a release for High Country. Apparently cowed by Edwards' threats of bad faith, United Fire placed its own interests ahead of its insured's and essentially abandoned High Country.

60.     And, by withholding the Policy from its insured until late in the process, despite High Country's numerous requests, United Fire effectively deprived High Country of the opportunity to provide any meaningful input before United Fire's rushed maneuvering to displace Pagnotta and accept a settlement to limit its own liability.

61.     United Fire tendered payment to the claimants in the amount of $2,868,127.34, representing the $3 million in automotive and umbrella coverage less $131,872.66 in *Ridley* payments that United Fire had already advanced.

62.     Thus left naked, High Country continued to attempt to negotiate and secure a release for itself.

63.     After United Fire's hasty separate settlement, High Country was stripped of all legitimate leverage to secure a release on favorable terms. All of the risk of proceeding to court fell on High Country alone, as United Fire's settlement dramatically reduced the claimants' litigation risk profile and effectively bankrolled their case against High Country.

64.     On December 27, 2017, High Country wrote to United Fire and Huso to advise them of Edwards' last and best offer to settle with High Country: the claimants would provide a release in exchange for an additional $1.275 million cash payment plus the assignment of certain potentially valuable legal claims.

65.     High Country's December 27 letter explained that United Fire's actions left High Country with no choice but to accept the deal and that it intended to take the offer and pursue recourse against United Fire unless:

A.     United Fire agreed to fund the $1.275 million cash component of the settlement; or

B.     United Fire agreed to defend and fully indemnify High Country without reservation, in which case High Country would reject the settlement and proceed to litigation.

66.     United Fire refused High Country's offer.

67.     High Country then proceeded to settle with the claimants for $1.275 million plus the assignment of certain legal claims.

68.     On May 25, 2018, High Country wrote to United Fire once more. High Country's letter explained, in detail, the practical and legal problems with United Fire's conduct and how High Country had been harmed by United Fire's decision to dump policy limits in substantial excess of the claimants' *Ridley* damages, leaving High Country bare to potential excess liability and with little-to-no negotiating power.

69.     High Country's letter explained, *inter alia*, that under Montana law, insurers have a duty to:

A.     Fairly consider their insured's exposure to excess liability in evaluating a settlement offer;

B.     Give the insured's interests at least as much consideration as the insurer gives its own; and

C.     Exercise diligence, intelligence, good faith, and honest and conscience fidelity to the insurer's and the insured's common interests.

70.     High Country's letter explained why Mr. Pagnotta's assessment of *Ridley* and its progeny was correct, showing how the twenty-plus-year history of

relevant Montana caselaw makes abundantly clear that:

A.   An insurer's duty to pre-pay an injured claimant's damages under *Ridley* is limited to certain special damages (specifically medical expenses and lost income) and expressly *excludes* potential future economic damages, general non-economic damages and punitive damages;

B.   Damages must be beyond reasonable dispute in terms of *both* causation *and* amount to trigger *Ridley*, otherwise there are disputed claims that present triable issues of fact;

C.   The duty to advance pay policy limits without a release is limited to situations where undisputed *Ridley* damages clearly exceed the limits of coverage;

D.   Thus, it is appropriate to condition payment of policy limits on a release where undisputed special damages are *less* than policy limits, because in that situation paying limits is a compromise of a disputed claim; and

E.   For these reasons, United Fire was correct in initially offering to pay all of the claimants' *Ridley* damages without a release, but insisting upon a release for High Country if it chose to settle the disputed part

of the claim by paying policy limits.

71.     High Country further explained the resulting harm it suffered when United Fire reversed course and, against the advice and analysis of Mr. Pagnotta (which was also the same advice its coverage counsel, Ms. Huso, gave it), accepted Edwards' initial offer at the first hint of a third-party bad faith claim.

72.     As explained in High Country's letter, because of United Fire's decision to hastily settle, coupled with its refusal to provide commercial general liability coverage after failing to provide the Policy language and relevant exclusions, United Fire:

A.     Settled a disputed claim for its exclusive benefit, in dereliction of its duty to consider and advance the interests of its insured;

B.     Bankrolled the claimants' prospective litigation against High Country;

C.     Deprived High Country of meaningful support in securing a release for itself and denied it any meaningful opportunity to pursue and participate in a combined settlement; and

D.     Stripped High Country of legitimate leverage to negotiate and secure a release on more favorable terms, having eliminated any risk the prospective plaintiffs may have faced in going to trial to prove and affix a value to their non-*Ridley* damages.

73.     As a result, High Country explained, United Fire's offer to continue defending High Country was a hollow gesture, transparently designed to provide cover for United Fire's decision to dump policy limits and settle out from under its insured. With the cards thus stacked against it, High Country had no choice but to settle on the terms Edwards offered.

74.     For these reasons, High Country's letter demanded payment of $1.45 million to compensate it for the harm United Fire caused.

75.     On June 30, 2018, United Fire responded to High Country's letter. Without analyzing any of High Country's authority or responding to its arguments, United Fire rejected High Country's demand, claiming it had "carefully considered" its obligations under Montana law in deciding to separately settle its own liability and set High Country adrift.

## COUNT I – UNFAIR CLAIM SETTLEMENT PRACTICES

76.     Plaintiff incorporates the preceding allegations by reference and restates them as if set forth fully herein.

77.     Montana law prohibits certain claim settlement practices that are deemed by the legislature to be unfair, deceptive, or contrary to public policy and affords an aggrieved insured a private cause of action where, *inter alia*, its insurer fails to act in good faith "to effectuate prompt, fair, and equitable settlement of

claims…" and/or where it "misrepresent[s] pertinent facts or insurance policy provisions relating to coverages at issue…." §§ 33-18-201(1), 33-18-201(6) and 33-18-242, MCA.

78.     Only a fraction of the claimants' damages were reasonably certain special damages under *Ridley*.

79.     Such damages were substantially less than the limits of the insurance coverage High Country paid United Fire to provide.

80.     The remaining claimed damages were uncertain future special damages, general non-economic damages, and punitive damages. Such damages were subjective, uncertain, depended on undiscovered and untried questions of fact, and were otherwise "debatable."

81.     United Fire's decision to pay the full $3 million demand was thus not compelled by *Ridley* or any other Montana law. It was a settlement of a disputed claim that United Fire was entitled and obligated to condition on a release for High Country.

82.     Contrary to United Fire's November 30 letter advising of the "unlikely" possibility of excess liability as a result of a *verdict at trial*, United Fire's actions pre-decided, to High Country's detriment, that damages would necessarily exceed coverage.

83. By and through the actions and decisions described above, United Fire acted unfairly, deceptively, failed to consider and act in defense of High Country's interests, and otherwise demonstrated bad faith and failed to discharge its statutory duties to High Country. Specifically:

A. By choosing to pay policy limits in substantial excess of *Ridley* damages without a release and before a lawsuit was even initiated, and when insurance defense counsel and United Fire's own coverage counsel agreed there was no duty to do so under Montana law, United Fire capitulated to a baseless threat of third-party bad faith liability and unfairly prioritized its own interests over achieving a settlement that was fair and equitable, in breach of its duty under § 33-18-201(6), MCA;

B. By initially misrepresenting the available coverage and repeatedly ignoring High Country's requests for copies of its Policy, misrepresenting that the Policy was not available, rearranging the Policy to emphasize the exclusions United Fire intended to invoke, then relying on said exclusions to deny additional coverage that might have facilitated a global settlement, United Fire breached its duties under § 33-18-201(1) and (6), MCA; and

C.    By failing to pursue and secure a final settlement within policy limits that included a release for High Country when United Fire's counsel advised there was an opportunity to do so in January of 2017 or before, United Fire breached its duties to High Country under § 33-18-201(6), MCA.

84.    United Fire substantially harmed High Country by and through its breaches of its statutory duties.

85.    High Country is therefore entitled to compensatory damages in an amount sufficient to make it whole as determined by the jury at trial, plus an award of attorney's fees and litigation costs. *Mountain West Farm Bureau Mut. Ins. Co. v. Brewer*, 2003 MT 98, 315 Mont. 231, 69 P.3d 652.

86.    United Fire's conduct also demonstrates a reckless indifference to a known risk of harm to High Country and was otherwise actually fraudulent and malicious, warranting imposition of punitive damages in an amount the jury determines sufficient to punish and deter such conduct. §§ 33-18-242(4) and 27-1-221(1)–(2), MCA.

## COUNT II – BREACH OF CONTRACT

87.    Plaintiff incorporates the preceding allegations by reference and restates them as if set forth fully herein.

88. United Fire breached its contract with High Country in at least three ways. United Fire:

A. Breached its contractual duty to indemnify High Country by denying coverage under the commercial general liability section of the Policy;

B. Breached its duty to defend High Country; and

C. Breached the implied covenant of good faith and fair dealing.

89. High Country purchased and paid for commercial general liability coverage in the amount of $1 million per-occurrence.

90. Edwards, on behalf of the claimants, made allegations about negligent conduct unrelated to the operation of an insured vehicle, including allegations of negligent training, maintenance and supervision, for which the automotive section of the Policy did not provide coverage

91. The claimants demanded payment for losses for which the automotive section of the Policy did not provide coverage, including $2.5 million in excess of the automotive and umbrella coverages.

92. High Country tendered the claim under its CGL coverage and demanded that United Fire make available an additional $1 million to try to settle the claim with a release for High Country.

93. United Fire refused High Country's demand in reliance upon an

"Aircraft, Auto or Watercraft" exclusion in High Country's CGL policy and an endorsement thereto containing an additional exclusion containing a "Multiple Liability Coverages Limitation."

94.     The Policy, and these provisions of the Policy in particular, fail to comply with Montana Property and Casualty Insurance Policy Language Simplification Act. Neither of the exclusions United Fire invoked to deny CGL coverage was set forth in a table of contents or a "notice section of important provisions" as required by § 33-15-337(2), MCA.

95.     Under Montana law, provisions of an insurance policy that violate § 33-15-337(2), MCA, are unenforceable and, as a matter of law and public policy, cannot be relied upon by an insurer to deny coverage. *Montana Petroleum Tank Release Compensation Board v. Crumley's, Inc.*, 2008 MT 2, 341 Mont. 33, 174 P.3d 948.

96.     In addition, the "Multiple Liability Coverages Limitation" endorsement invoked by United Fire is ambiguous and did not clearly exclude CGL coverage in this case. Ambiguous exclusions in an insurance policy must be liberally construed against the insurer and in favor of coverage. *Mountain West Farm Bureau v. Neal*, 169 Mont. 317, 322, 547 P.2d 78, 82 (1976).

97.     In addition, United Fire was not entitled to rely upon the "Aircraft,

Auto or Watercraft" or the "Multiple Liability Coverages Limitation" exclusions and is estopped from invoking those provisions as a basis for denying coverage after failing to timely and accurately apprise High Country of the terms of its own Policy.

98.    United Fire thus breached its contractual obligations to High Country by refusing High Country's demand for an additional $1 million in CGL coverage to help settle the claim with a release for High Country.

99.    High Country was damaged by this breach in an amount not less than $1 million dollars, the amount of the coverage that was wrongfully withheld.

100.   The insurance contract between United Fire and High Country also imposed upon United Fire a duty to defend.

101.   United Fire breached its duty to defend High Country by taking steps to sabotage High Country's defense in order to advance United Fire's separate interests. United Fire's commitment to provide High Country with a defense, thereafter, was a hollow gesture.

102.   In addition, in Montana, every contract contains an implied covenant of good faith and fair dealing. The covenant arises not from the contract itself, but from the parties' "justifiable expectations" regarding its performance. *Hardy v. Vision Serv.'s Plan*, 2005 MT 232, ¶ 13, 328 Mont. 385, 120 P.3d 402. It requires "honesty in fact and the observance of reasonable commercial standards of fair

dealing in the trade." *Bridger Del Sol, Inc. v. Vincentview LLC*, 2017 MT 293, ¶ 10, 406 Mont. 415, 389 P.3d 415. It "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *HSBC Bank USA, Nat. Assoc. v. Anderson*, 2017 MT 257, ¶ 48, 389 Mont. 106, 406 P.3d 416.

103.    The implied covenant of good faith and fair dealing can be breached by either dishonest "or" commercially unreasonable conduct that deprives the other party of its justifiable expectations in contracting. *May v. ERA Landmark*, 2000 MT 299, ¶ 49, 302 Mont. 326, 15 P.3d 1179.

104.    By and through the actions and decisions described above, United Fire acted dishonestly and departed from reasonable commercial standards of fair dealing and deprived High Country of its reasonable expectations, including but not limited to its expectations that:

A.    The settlement of disputed claims and liabilities would include a release for the insured, and not just the insurer;

B.    United Fire would act promptly to achieve a resolution that protected its insured when there was an opportunity to do so and when United Fire perceived a risk of exposure to liability in excess of coverage;

C.    United Fire would fairly investigate and faithfully apply the law in

ascertaining and discharging its obligations to its insured;

D.      High Country would have a fair opportunity to participate in coordinated negotiations and settle all potential liability as part of a single package on the most favorable terms possible;

E.      High Country would not be forced to settle its potential excess liability under threat of a lawsuit financed by its insurer;

F.      United Fire would not misrepresent the status and contents of High Country's Policy, or rearrange the contents of the Policy to emphasize provisions that United Fire would rely upon to deny coverage; and

G.      At a minimum, United Fire would timely provide a copy of the Policy so its insured could be informed to the same extent as United Fire and its lawyers, and the claimants and their lawyers, while these momentous decisions were under consideration.

105.    These departures from commercially reasonable standards of good faith and fair dealing amount to a breach of the insurance contract.

106.    High Country is therefore entitled to compensatory damages in an amount sufficient to make it whole as determined by the jury at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff High Country prays for judgment against Defendant

United Fire on each of the above counts and for an award of all relief to which High Country is entitled under the law and as a matter of equity, including but not limited to:

1.      An award of damages sufficient to compensate High Country for United Fire's conduct, in an amount to be determined at trial;

2.      An award of reasonable attorney's fees and litigation costs;

3.      An award of pre- and post-judgment interest as allowed by law;

4.      Imposition of punitive damages sufficient to punish and deter such conduct, in an amount to be determined at trial; and

5.      All other and further relief this Court deems just and fair.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

DATED this 29th day of March, 2019.

**GOETZ, BALDWIN, & GEDDES, P.C.,**

Attorneys for High Country Paving, Inc.

*/s/ Robert K. Baldwin*
            Robert K. Baldwin
            Trent. M. Gardner
            Jeffrey J. Tierney